IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO.

| | | |
|---|---|---|
| SOUTHLAND NATIONAL INSURANCE CORPORATION in Liquidation; BANKERS LIFE INSURANCE COMPANY in Rehabilitation; COLORADO BANKERS LIFE INSURANCE COMPANY in Rehabilitation; and the SPECIAL DEPUTY REHABILITATORS of COLORADO BANKERS LIFE INSURANCE COMPANY and BANKERS LIFE INSURANCE COMPANY and the SPECIAL DEPUTY LIQUIDATORS of SOUTHLAND NATIONAL INSURANCE CORPORATION, on behalf of both the policyholders and creditors of each of these insolvent companies, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| GREG E. LINDBERG, CHRISTOPHER HERWIG, DEVIN SOLOW, GLOBAL GROWTH HOLDINGS, INC., STANDARD ADVISORY SERVICES, LTD., EDWARDS MILL ASSET MANAGEMENT, LLC, ACADEMY FINANCIAL ASSETS, LLC, ALPHARETTA, LLC, AR PURCHASING SOLUTIONS, LLC, AR PURCHASING SOLUTIONS 2, LLC, COMPLYSMART, LLC AUGUSTA ASSET MANAGEMENT, LLC, BALDWIN ASSET MANAGEMENT, LLC, CAPITAL ASSETS FUND I, LLC,  CAPITAL ASSETS FUND II, LLC,  CAPITAL ASSETS FUND IV, LLC, CAPITAL ASSETS FUND V, LLC, CAPITAL ASSETS MANAGEMENT, II, LLC, CAPITAL ASSETS MANAGEMENT III, LLC, CHATSWORTH ASSET MANAGEMENT, LLC, CV INVESTMENTS, LLC, DAMASCUS ASSET MANAGEMENT, LLC, EPHESUS ASSET MANAGEMENT, LLC, FOREST PARK ASSET MANAGEMENT, LLC, GBIG HOLDINGS, LLC, GILFORD ASSET MANAGEMENT, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **[JURY TRIAL DEMANDED]** |

HAMPTON ASSET MANAGEMENT, LLC,       )
HPCSP INVESTMENTS, LLC, INTRALAN     )
INVESTMENTS LIMITED, IRON CITY ASSET )
MANAGEMENT, LLC, ITECH FUNDING, LLC, )
JACKSON ASSET MANAGEMENT, LLC, KITE  )
ASSET MANAGEMENT, LLC, LILLY ASSET   )
MANAGEMENT, LLC, MARSHALL ASSET      )
MANAGEMENT, LLC, PARADISE ASSET      )
MANAGEMENT, LLC, ROCKDALE ASSET      )
MANAGEMENT, LLC, STANDARD FINANCIAL  )
LIMITED, SUMMERVILLE ASSET           )
MANAGEMENT, LLC, and TYBEE ISLAND    )
ASSET MANAGEMENT, LLC,               )
                                     )
    Defendants.

  Plaintiffs, by and through counsel, hereby allege as follows their Complaint against Defendants.

## NATURE OF THE MATTER

  Insurance companies operate on two simultaneous fronts. On one side, they sell policies or insurance products and provide services to the people who purchase those policies and products. The sale of the insurance policies and products yields money for the insurance companies and creates obligations for them, and so, as a result, insurance companies also must manage the other side of the business: investing those policyholder funds in an appropriate manner in order to meet their obligations to policyholders and other creditors. In this aspect of their business, insurance companies are not dissimilar to a retail bank, and like a bank, their investments are regulated to ensure that their customers are protected.

  In 2014, Greg Lindberg purchased his first insurance company—Southland National Insurance Corporation. He then moved that company from Alabama to

North Carolina. At that time, North Carolina law did not limit the amount of money that an insurance company could invest into "affiliated" companies—that is, companies that are ultimately owned by the same person.[1] Over the next several years, Lindberg aggressively exploited this legal loophole—purchasing more insurance companies, moving them to North Carolina, and directing them to loan money to fund his acquisition of dozens of companies in a variety of non-insurance industries. Put simply, he used billions of dollars of policyholder money to buy himself a small empire of companies.

Lindberg originally called this collection of non-insurance companies Eli Global, which later was renamed Global Growth. As the ultimate owner of the Global Growth companies, Lindberg holds all of the upside of any increase in value of the businesses he purchased using policyholder money. His insurance companies and their policyholders, by contrast, hold all the risk if those same businesses fail to repay their loans.

This "heads I win, tails you lose" investment strategy was not the only way that Lindberg took advantage of the insurance companies and their policyholders. Insurance company funds were also used for investments that were inadequately researched and overpriced. The investments were not adequately collateralized. The Defendants extracted exorbitant fees from the transactions. In fact, Lindberg went so far as to create a Malta-based investment advisory company—Standard Advisory Services Limited—so that he and his co-conspirators could charge the insurance

---

[1] The North Carolina General Assembly closed this loophole through an amendment to the General Statutes in July of 2019.

companies for providing the "investment advice" of using their money to buy companies for him. Most critically, the Defendants failed entirely to consider the insurance companies' obligations to their policyholders and to ensure that the investments would yield adequate returns at the proper time to meet those obligations.

As set forth in more detail below, Lindberg and his associates formed a racketeering enterprise that engaged in a multi-year scheme to defraud the insurance companies and their policyholders.[2] The members of the enterprise, including the Defendants, used the Plaintiff Insurance Companies as their personal piggy bank to buy themselves companies and to compensate themselves handsomely, with little regard for the operating companies' performance or the insurance companies' obligations. The money that Defendants extracted was not justified by business success. They enriched themselves at the expense of the Plaintiff Insurance Companies—and, ultimately, their policyholders.

<u>PARTIES</u>

1.     Southland National Insurance Corporation ("SNIC"), Bankers Life Insurance Company ("BLIC"), and Colorado Bankers Life Insurance Company ("CBL") (collectively, "Plaintiff Insurance Companies") are North Carolina-domiciled

---

[2] Plaintiffs have no evidence, and do not allege, that the operating companies that Defendants acquired, their managers, or their employees were aware of or participants in Defendants' scheme. Indeed, Defendants have declared on many occasions that the operating companies run themselves, with little to no input from the Global Growth team. Defendants did not add value by providing the operating companies with operational assistance or improvement. Instead, Defendants simply captured the operating companies' equity and their revenue—and used Plaintiffs' money to do so.

4

insurance companies indirectly owned by Defendant Lindberg. Plaintiff Insurance Companies' principal place of business is Raleigh, North Carolina.

2.      Pursuant to N.C. Gen. Stat. §§ 58-30-85(a)(1) and 58-30-120(a)(1), North Carolina Commissioner of Insurance Mike Causey appointed Mike Dinius ("Dinius") and John Murphy ("Murphy") as Special Deputy Rehabilitators for BLIC and CBL and Special Deputy Liquidators of SNIC (together, "SDRs"). Under these statutes, the SDRs act with all of the powers of the court-appointed Rehabilitator and Liquidator. The SDRs bring these claims on behalf of the policyholders and creditors of Plaintiff Insurance Companies pursuant to N.C. Gen. Stat. §§ 58-30-85(a)(13) and 58-30-120(a)(13) and in the names of the Plaintiff Insurance Companies pursuant to N.C. Gen. Stat. §§ 58-30-85(a)(12) and 58-30-120(a)(12). Together, the SDRs and the Plaintiff Insurance Companies are "Plaintiffs" in this matter.

3.      Greg E. Lindberg ("Lindberg") is a resident of Florida. Lindberg was the founder and Chairman of Global Growth Holdings, Inc., a privately held investment company headquartered in Florida. His portfolio of non-insurance companies operated under the trade name "Eli Global," which later was changed to "Global Growth."[3] Lindberg was the Chairman of the Board for each of the Plaintiff Insurance Companies and also served as a member of their Investment Committees. Lindberg was also a director of Standard Advisory Services Limited ("SASL"), which was retained as an investment adviser to the Plaintiff Insurance Companies.

---

[3] This Complaint refers to the portfolio of companies as "Global Growth" throughout the relevant period.

4. Christopher Herwig ("Herwig") is a resident of Raleigh, North Carolina. From 2010 through 2018, Herwig was the Chief Investment Officer ("CIO") for Global Growth Holdings, Inc., and from 2016 through 2018, he was also the CIO of the Plaintiff Insurance Companies. Herwig was a board member for each Plaintiff Insurance Company and the chair of their investment committees. During 2017 through 2018, Herwig was also a director of SASL, a member of SASL's investment committee, and SASL's portfolio manager.

5. Devin Solow ("Solow") is a resident of Durham, North Carolina. Solow served in various roles at Global Growth Holdings, Inc., including initially as a Mergers & Acquisitions Associate, eventually holding the title of Vice President of Investments. At various times after he was hired in 2013, Solow also was employed by other Lindberg-controlled entities within the Global Growth family of companies.

6. Global Growth Holdings, Inc., f/k/a Academy Association, Inc. ("GGHI"), founded by Lindberg in 1991, is the largest holding company in Lindberg's privately-held consortium of over 500 non-insurance companies. GGHI is a Delaware corporation with its principal office presently located in Orlando, Florida. Lindberg is the sole shareholder of GGHI. Some, but not all, of the other Defendants and companies operating under the Global Growth portfolio are direct or indirect subsidiaries of GGHI.

7. GBIG Holdings, LLC, f/k/a Southland National Holdings, LLC ("GBIG Holdings"), is the holding company that Lindberg created to directly own the Plaintiff

6

Insurance Companies. GBIG Holdings is a Delaware limited liability company with its principal office in Durham, North Carolina.

8.     Standard Advisory Services Limited ("SASL"), is a limited liability company with its principal office in Valletta, Malta. It was registered with the United States Securities and Exchange Commission ("SEC") as an investment adviser from November 2016 until it withdrew its registration on October 1, 2019. Lindberg indirectly owns SASL, and Lindberg and Herwig were directors of SASL and were members of SASL's investment committee.

9.     Edwards Mill Asset Management, LLC, ("EMAM") is a North Carolina limited liability company with its principal office in Raleigh, North Carolina. EMAM was used, among other things, as a vehicle to falsely claim disaffiliation between the Plaintiff Insurance Companies and their investments into companies ultimately owned by Lindberg.

10.    Academy Financial Assets, LLC ("AFA") is a North Carolina limited liability company with its principal office in Orlando, Florida. AFA is indirectly owned by Lindberg. AFA's sole member is Academy Financial Holdings, LLC, which is organized under the laws of North Carolina, and whose sole member is GGHI. At all relevant times, Lindberg controlled AFA and the hundreds of millions of dollars flowing into and out of AFA on a monthly basis. AFA is also a direct borrower from one or more of Plaintiff Insurance Companies and is included among the Shell Borrowers, defined below in Paragraph 45.

7

11.     The individuals and entities identified in Paragraphs 3 through 10 are collectively referred to as the "Controlling Persons." During the relevant time period, the Controlling Persons acquired an interest in or control of the racketeering enterprise through the conduct set forth below.

12.     CV Investments, LLC, ("CVI") is a North Carolina limited liability company with its principal office in Orlando, Florida. CVI is indirectly owned by Lindberg, and Lindberg and Herwig were managers of CVI. CVI is a holding company of several providers of vision care to patients in Rhode Island and Massachusetts.

13.     HPCSP Investments, LLC, ("HPCSP") is a North Carolina limited liability company with its principal office in Orlando, Florida. HPCSP is indirectly owned by Lindberg and Lindberg was a manager of HPCSP. HPCSP is a holding company that is the owner of several medical companies.

14.     Intralan Investments Limited, ("Intralan") is a United Kingdom domiciled limited company with its principal office in the United Kingdom. Intralan is indirectly owned by Lindberg. Intralan was used, among other things, as a vehicle to acquire shares of GMK Pepper Holdings Limited. Lindberg and Herwig were directors of Intralan Investments.

15.     AR Purchasing Solutions, LLC, ("ARP") is a North Carolina domiciled limited liability company with its principal office in Orlando, Florida specializing in accounts receivable collection. ARP is indirectly owned by Lindberg. Lindberg was a manager of ARP, and Herwig was on its Board of Managers.

8

16.     AR Purchasing Solutions 2, LLC, ("ARP 2") is a North Carolina domiciled limited liability company with its principal office in Orlando, Florida. ARP 2 is indirectly owned by Lindberg.  Lindberg and Herwig were managers of ARP 2. ARP 2 was used, among other things, as a vehicle to purchase credit card receivables from President's Choice bank.

17.     ComplySmart, LLC, ("ComplySmart") is a North Carolina domiciled limited liability company with is principal office in Orlando, Florida.  ComplySmart provides security and compliance services to healthcare entities.  ComplySmart is indirectly owned by Lindberg, and Lindberg and Herwig were managers of ComplySmart.

18.     The entities identified in Paragraphs 12 through 17 are collectively referred to herein as "Company Borrowers."   The Company Borrowers have outstanding obligations to the Plaintiff Insurance Companies as a result of direct loans from the Plaintiff Insurance Companies or through various transactions that resulted in the assignment of loans so that the Plaintiff Insurance Companies presently have a direct lending relationship with the Company Borrowers.

19.     Standard Financial Limited, ("SFL") is a limited liability company with its principal office in Valletta, Malta.   At all relevant times, Lindberg controlled SFL and the millions of dollars that flowed into and out of it over time.

20.     iTech Funding, LLC, (iTech") is an Arizona limited liability company. Upon information and belief, its principal office is located in Arizona.   Lindberg

generally used iTech as an entity that borrowed and used insurance company money to purchase preferred equity in other Lindberg-affiliated companies.

21. Alpharetta, LLC, ("Alpharetta") is a Delaware limited liability company. Alpharetta is an entity utilized in an investment structure known as a "principal protected note" or "PPN" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

22. Augusta Asset Management, LLC, ("AAM") is a Delaware limited liability company. AAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

23. Baldwin Asset Management, LLC, ("BAM") is a Delaware limited liability company. BAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

24. Capital Assets Fund I, LLC, ("CAF I") is a North Carolina limited liability company with its principal office in Orlando, Florida. CAF I is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

25. Capital Assets Fund II, LLC, ("CAF II") is a North Carolina limited liability company with its principal office in Orlando, Florida. CAF II is an investment structure known as a "finance company" or "FinCo" that Lindberg,

Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

26.    Capital Assets Fund IV, LLC, ("CAF IV") is a North Carolina limited liability company with its principal office in Orlando, Florida.  CAF IV is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

27.    Capital Assets Fund V, LLC, ("CAF V") is a North Carolina limited liability company with its principal office in Orlando, Florida.  CAF V is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

28.    Capital Assets Management II, LLC, ("CAM II") is a North Carolina limited liability company with its principal office in Orlando, Florida.  CAM II is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

29.    Capital Assets Management III, LLC, ("CAM III") is a North Carolina limited liability company with its principal office in Orlando, Florida.  CAM III is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

30. Chatsworth Asset Management, LLC, ("Chatsworth") is a Delaware limited liability company. Chatsworth is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

31. Damascus Asset Management, LLC, ("DAM") is a Delaware limited liability company. DAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

32. Ephesus Asset Management, LLC, ("EAM") is a Delaware limited liability company. EAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

33. Forest Park Asset Management, LLC, ("FAM") is a Delaware limited liability company. FAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

34. Gilford Asset Management, LLC, ("GAM") is a Delaware limited liability company. GAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

35.     Hampton Asset Management, LLC, ("HAM") is a Delaware limited liability company.  HAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

36.     Iron City Asset Management, LLC, ("Iron City") is a Delaware limited liability company.   Iron City is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

37.     Jackson Asset Management, LLC, ("JAM") is a Delaware limited liability company.  JAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

38.     Kite Asset Management, LLC, ("KAM") is a Delaware limited liability company.  KAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

39.     Lilly Asset Management, LLC, a/k/a Lily Asset Management, LLC, ("LAM") is a Delaware limited liability company.  LAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

40.  Marshall Asset Management, LLC, ("MAM") is a Delaware limited liability company.  MAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

41.  Paradise Asset Management, LLC, ("PAM") is a Delaware limited liability company.  PAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

42.  Rockdale Asset Management, LLC, ("RAM") is a Delaware limited liability company.  RAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

43.  Summerville Asset Management, LLC, ("SAM") is a Delaware limited liability company.  SAM is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

44.  Tybee Island Asset Management, LLC, ("Tybee") is a Delaware limited liability company.  Tybee is an investment structure known as a "finance company" or "FinCo" that Lindberg, Herwig, Solow, and GGHI used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies.

45.  The entities identified in Paragraphs 19 through 44, along with AFA, are collectively referred to herein as "Shell Borrowers."  The Shell Borrowers also

have outstanding obligations to the Plaintiff Insurance Companies as a result of direct loans from the Plaintiff Insurance Companies or through various transactions that resulted in the assignment of loans to the Plaintiff Insurance Companies.

**OTHER MEMBERS AND ASSOCIATES OF THE ENTERPRISE**

46.      In addition to the Defendants, the Enterprise, as defined below in Paragraph 281, had numerous additional members and associates that joined with the Defendants to defraud Plaintiffs and others.

47.      There were additional companies that Lindberg used to extract money from his corporate empire, including money that originated from Plaintiff Insurance Companies, and that he used to pay the personal expenses that facilitated his extravagant lifestyle ("Lindberg Entities").  These included the following companies:

| Lindberg Entities | |
|---|---|
| Dunhill Holdings, LLC | New Hill Asset Management, LLC |
| Acquired Development, LLC | Sedwick, LLC |
| Apex International, LLC | Northern Air, LLC |
| Skyworld Corporation, LLC | American Yacht Charters, LLC |
| South Hill Holdings, LLC | |

48.      There were additional companies called "Special Purpose Vehicles" or "SPVs" that the Controlling Persons used as a vehicle to, among other things, falsely claim disaffiliation between the Plaintiff Insurance Companies and their investments into companies ultimately owned by Lindberg, as described below in Paragraphs 129 to 132.  The SPVs included the following companies:

| SPVs | |
|---|---|
| AAH Loan-Backed Funding, LLC | Jasmine Five LLC |
| Anaconda, LLC | Kenly LLC |
| Asheboro, LLC | Lilac Six, LLC |

15

| | |
|---|---|
| Athens, LLC (Integrity EMR, LLC) | Louisburg LLC |
| Augusta, LLC (FTGU Medical Billing, LLC) | Macon, LLC (SBL Media LLC SPV) |
| BCC Jr Loan-Backed Funding, LLC | Magnolia Eight LLC |
| Berkeley Lake LLC | Marigold Nine, LLC |
| BKT Loan-Backed Funding, LLC | Mooresville LLC |
| Blue Daffodil LLC | Norlina LLC |
| Blue Violet, LLC | Orchid Five, LLC |
| Casar LLC | Periwinkle Seven LLC |
| Celadine Eight LLC | Petunia Ten LLC |
| Chrysanthemum Two, LLC | Pink Tulip LLC |
| Clayton, LLC | Red Daisy, LLC |
| CLTC Jr Loan-Backed Funding, LLC | Rose Four, LLC |
| CLTC Sr Loan-Backed Funding, LLC | Secured Ln-Backed Fdg I LLC |
| CMC Loan-Backed Funding, LLC | Secured Ln-Backed Fdg II LLC |
| Cobra LLC | Secured Ln-Backed Fdg III LLC |
| Columbus LLC | Secured Ln-Backed Fdg IV LLC |
| Cowper, LLC | Secured Ln-Backed Fdg V LLC |
| Creston LLC | Secured Ln-Backed Fdg VI LLC |
| Daffodil Six, LLC | Secured Ln-Backed Fdg VII LLC |
| Derry, LLC | Secured Ln-Backed Fdg VIII LLC |
| Douglasville | Secured Ln-Backed Fdg IX LLC |
| Eatonton LLC | Secured Ln-Backed Fdg X LLC |
| Elberton, LLC | Secured Ln-Backed Fdg XI LLC |
| Faison LLC | Secured Ln-Backed Fdg XII LLC |
| Fargo, LLC | Secured Ln-Backed Fdg XIII LLC |
| Fayetteville LLC | Secured Ln-Backed Fdg XIV |
| Flemington LLC | Secured Ln-Backed Fdg XV LLC |
| Flovilla, LLC | Secured Ln-Backed Fdg XVI LLC |
| Flowery Branch, LLC | Secured Ln-Backed Fdg XVII LLC |
| Folkston LLC | SFM Loan-Backed Funding, LLC |
| Forsyth, LLC | Shirt LLC |
| Gardenia One LLC | Southeast Modular Mfg. - Ellaville, LLC |
| Garfield LLC | Sunflower Six LLC |
| Geranium Two, LLC | TCC Jr Loan-Backed Funding, LLC |
| Gillsville LLC | TCI Loan-Backed Funding, LLC |
| Greenville, LLC | Tornado, LLC |

16

| | |
|---|---|
| Holt LLC | Valdosta LLC |
| Iredell LLC | Whitaker Mill LLC |
| Iris Four LLC | Williamson LLC |
| Jacksonville LLC | Yarrow Three, LLC |

49.     There were additional companies the Controlling Persons utilized in an investment structure known as a "principal protected note" or "PPN" that the Controlling Persons used to facilitate loans from the Plaintiff Insurance Companies to other Lindberg-affiliated companies, as described below in Paragraphs 229 to 237 ("PPN Entities").  The PPN Entities included the following companies:

| PPN Entities | |
|---|---|
| Alpharetta | NOM GB 2018 I, LLC |
| Marseille ELN 2018-1 LLC | Pierre Mendes, LLC |
| Franklin Street 2018-1, LLC | Whitehorse 2018 I, LLC |
| Lombard Street LLC | White Tree, LLC |
| Lombard Street II LLC | |

50.     There were additional operating companies and parent companies that the Controlling Persons used to facilitate loans from the Plaintiff Insurance Companies ("Operating Companies"), including the following companies:

| Operating Companies | |
|---|---|
| A/R Allegiance Group | Eye & Lasik |
| AAH | Financial Institute Advisors LLC |
| IO Practiceware Inc | Franklin Eye Care Associates LLC |
| American Healthcare Alliance, Ltd. | Helix Health Limited |
| Claris Vision Holdings | Helix Health Technologies Limited |
| Coding Institute LLC | Helix Health UK Limited |
| BCC Research, LLC | WesternB Investments LLC |
| Beckett Collectibles Inc | MDO |
| Castle & Cooke Mortgage | Med Claim |
| CBCS Operations LLC | Mplus |
| CBV 1042488 B.C Ltd. | MVE Holdings, LLC |
| Certification For Long-Term Care, LLC | Nationwide Recovery Systems, Ltd. |

17

| Collection Management Company | Nebb Hldgs LLC |
|---|---|
| Transcon | PCF LLC |
| DJRTC, LLC | Penn Medical |
| Drummond Group, LLC | Practice Builders |
| Eli Denmark Investments, APS | Socrates Healthcare Limited |
| Engaged Media Inc | |

51.    There were additional individuals and entities not named as Defendants in this action whose actions facilitated, assisted, and furthered the fraudulent scheme set forth herein ("Facilitating Persons"), including:

| Facilitating Persons | |
|---|---|
| Eli Research, LLC | New England Capital, LLC |
| Eric Bostic | PB Life and Annuity Co., Ltd. |
| John Gray | PBX Bermuda Holdings, Ltd. |
| Justin Holbrook | Sandi White |
| Brigitte Hurley | Various attorneys who facilitated the fraudulent scheme |
| Ray Martinez | |

**JURISDICTIONAL STATEMENT AND VENUE**

52.    Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

53.    Supplemental jurisdiction is proper pursuant to 28 U.S.C. § 1367 over each of the claims based on North Carolina state law because they are so related to claims in the action within the original jurisdiction of this court that they form part of the same case or controversy under Article III of the United States Constitution.

18

54. Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

<u>FACTUAL ALLEGATIONS</u>

## The Business of Insurance

55. Insurance is designed to protect consumers, known as "policyholders," from the risk of financial loss resulting from unknown future events. In a common insurance transaction, a consumer pays a fee—known as a "premium"—to an insurance company in exchange for the insurer's promise to pay future claims arising from some defined event, like death or a car accident. Certain insurance companies also offer investment products known as annuities which provide guaranteed income or a return over an agreed upon period of time under the terms of a contract.

56. An insurance company's ability to make claim and/or annuity payments to its policyholders depends on the insurance company having sufficient assets or funds available. To make claim and annuity payments, an insurance company could draw on policyholder premiums that it had invested or on other assets or funds held by the insurance company.

57. Insurance companies typically seek to make a profit by taking the premiums that they receive from policyholders and investing those funds in hopes of achieving a rate of return such that the total of principal and return exceeds the total of the amounts owed to the policyholders and the company's operating expenses.

58. In some forms of insurance, the obligation to the policyholder is contingent on some unknown future event. For example, a person may have

19

insurance to cover the losses associated with a car accident and that person is never in an accident. In those instances, the premiums paid by the policyholder exceed the insurance company's obligations to them. By contrast, another person may have the same car insurance policy, and might get into an accident that requires the insurance company to pay for the full value of the insured vehicle. In that case, the insurance company's obligations to the policyholder could greatly exceed the premiums paid by the policyholder.

59.   When the insurance company's obligations to the policyholder are unknown and contingent, the insurance company can make a profit in at least two ways: (1) by correctly pricing insurance policies relative to risk to ensure the maximum likelihood of profitability; and (2) by investing the policyholder premiums.

60.   In other forms of insurance, such as certain annuities, the insurance company's obligations to the policyholder are known, because they are fixed by contract. For example, a person might purchase an annuity that is guaranteed to produce a 3% rate of return until the time the policyholder claims payment in 5 years.

61.   When the insurance company's obligations to the policyholder are fixed, then the ways in which the insurance company can make money are narrowed. To meet its obligations to such a policyholder, the insurance company's investments must yield at least 3% annually plus the cost of sale and administration over 5 years. To turn a profit, the insurance company's investments must exceed all of its contractual liability, costs, and expenses—including any commissions paid to insurance agents in connection with selling the annuity.

62. Accordingly, in the known, fixed obligation scenario, an insurance company must ensure that its investments: (1) perform at a level sufficient to generate a profit (based both on return and risk of default) and (2) are scheduled to mature at the same time as the policyholder obligations come due, or are otherwise available, so as to ensure there is sufficient cash on hand to pay policyholders.

## Insurance Regulation

63. State insurance regulators seek to limit the risk of insurance companies becoming insolvent by restricting certain business practices, by conducting financial oversight, and by establishing risk-based capital requirements.

64. In an effort to ensure that insurance companies can pay future claims, state laws and regulations require regular financial reporting and restrict how insurance companies can operate, including how they invest their funds. State insurance regulators often limit or prohibit investment in certain types of holdings resulting in a certain percentage of the portfolio being invested in low-risk holdings, such as government bonds and cash equivalents.

65. Generally, insurance companies like the Plaintiff Insurance Companies must comply with state law-mandated capital requirements to ensure the company has sufficient cash or liquid assets to pay policyholder claims in a timely manner.

66. State insurance laws also empower insurance regulators to conduct various forms of oversight, including financial examinations.

67. Chapter 58 of the North Carolina General Statutes ("North Carolina's Insurance Law") governs the business of insurance for companies domiciled in North

Carolina. North Carolina's Insurance Law contains a number of restrictions on the operation of insurance companies, including restrictions on how insurance companies invest their assets. North Carolina's Insurance Law also contains a number of requirements for insurance companies, including requirements regarding reporting of financial results, transactions with affiliated companies, dividend payments, redomestication, and acquisitions.

68. North Carolina's Insurance Law specifically states that "the public interest and the interests of policyholders are or may be adversely affected when . . . control of an insurer is sought by persons who would utilize such control adversely to the interests of policyholders, an insurer . . . is caused to enter into transactions or relationships with affiliated companies that are not fair and reasonable, or when an insurer pays dividends to shareholders that jeopardize the financial condition of such insurer." N.C. Gen. Stat. § 58-19-1.

69. The North Carolina Department of Insurance ("NCDOI") conducts oversight of North Carolina insurance companies and enforcement of North Carolina's Insurance Law. The Insurance Commissioner, who is elected by the people of North Carolina, heads NCDOI.

70. Each of the Plaintiff Insurance Companies was required to invest its funds consistent with North Carolina's Insurance Law, including investing policyholder funds consistent with the regulatory limits that are designed to protect the policyholders.

71. Each of the Plaintiff Insurance Companies maintained a written investment policy and investment guidelines which, along with North Carolina's Insurance Law, governed the asset classes (e.g., U.S. Treasury Securities, corporate debt obligations, asset-backed securities, etc.) and the asset concentration levels in which each insurance company could invest. The stated objective of each of the Plaintiff Insurance Companies' investment strategies was to preserve capital by investing in stable, conservative, and highly liquid assets.

## Lindberg's Acquisition and Redomestication of Plaintiff Insurance Companies to North Carolina

72. Lindberg acquired Plaintiff SNIC in August 2014 and redomesticated it from Alabama to North Carolina in December of that year.

73. At that time, North Carolina law placed no statutory limits on the percentage of investments that an insurance company could make into affiliated companies—that is, companies who shared common ownership with the insurance company.

74. North Carolina law was unusual in this regard, as many states expressly limit investment into affiliated companies to 10% of the insurance company's overall investments, absent express authority from the relevant state regulator.

75. Investments into affiliated companies present unique risks for insurance companies because a negative economic event for the common owner of both the insurance company and the affiliated companies risks the failure of both. This is referred to as "enterprise risk."

23

76.     Because investments into affiliated companies may not be conducted at arm's length, they also present the risk that the terms of those transactions are not fair and reasonable to the insurance company lender.

77.     Upon information and belief, at the time Mr. Lindberg directed the redomestication of SNIC to North Carolina, he had entered into an agreement with then-Commissioner of Insurance Wayne Goodwin that would allow SNIC to make up to 40% of its investments into "non-investment grade affiliated investments."

78.     From 2015 to 2017, Mr. Lindberg acquired two additional insurance companies—BLIC and CBL—and redomesticated them to North Carolina. The Plaintiff Insurance Companies were collectively managed by another company that Lindberg owned, Global Bankers Insurance Group, LLC ("GBIG").

**Explosive Growth**

79.     From 2016 through 2018, Lindberg and Herwig caused the Plaintiff Insurance Companies to offer annuities with interest rates at or near the top of the market.

80.     During this time, Lindberg and Herwig also caused the Plaintiff Insurance Companies to offer commission rates at or near the top of the market.

81.     By offering attractive interest rates and generous commissions, the annuities that the Plaintiff Insurance Companies offered were attractive to both investors and insurance agent sellers.

82.    In an 18-month period beginning in mid-2017 running through late 2018, under Lindberg's direction and control, Plaintiffs CBL and BLIC sold over *$2 billion* of multi-year guaranteed fixed annuities to policyholders.

83.    However, by offering high interest rates and high agent commissions, in order to be able to meet policyholder obligations, the Plaintiff Insurance Companies' investments would also have to perform at a higher rate and were therefore at a higher risk of default.

## Investment Scheme

84.    From 2014 to 2019, the Plaintiff Insurance Companies transferred approximately $3 billion to Defendants and other affiliated companies in loans, purchases, or assignments as a product of Defendants' unlawful and fraudulent investment scheme.

85.    The adequate performance of these investments was necessary to meet policyholder obligations, and so it was critical that these funds were invested appropriately.  Instead, Defendants placed policyholder money into improper and dangerous loans.

86.    The central idea of the Defendants' investment scheme was to take Plaintiff Insurance Companies' policyholder money and use it to purchase non-insurance companies for Lindberg, including the Company Borrowers and other revenue-generating operating companies.

87.    The Controlling Persons and others working with them effectuated this scheme by causing Plaintiff Insurance Companies to enter into loans to Lindberg or

one of his companies in order to purchase other, non-insurance companies that Lindberg would directly or indirectly own.

88.     From the time that each of the Plaintiff Insurance Companies was redomesticated to North Carolina until June 27, 2019, Lindberg, Herwig, and others working with them and at their direction had complete and exclusive control of the Plaintiff Insurance Companies' investments.

89.      For most of the affiliated investments, Lindberg or Herwig executed the agreements on behalf of both the lender and borrower.

90.     Lindberg was the Chairman of the Board for each of the Plaintiff Insurance Companies and also served as a member of their Investment Committees.

91.     At the same time, Lindberg was the sole shareholder of GGHI, which in turn owned or controlled most of the Borrower entities that received loans from the Plaintiff Insurance Companies.

92.     Herwig was a member of the Board of each of the Plaintiff Insurance Companies and also served as their Chief Investment Officer and the Chair of their Investment Committees.

93.     At the same time, Herwig was the Chief Investment Officer of GGHI.

94.     As officers and directors of the Plaintiff Insurance Companies, Lindberg and Herwig had a duty of care and duty of loyalty to the Plaintiff Insurance Companies and, by extension, their policyholders and creditors.

95.     However, in an egregious breach of their fiduciary duties to the Plaintiff Insurance Companies as well as their policyholders and creditors, Lindberg and

Herwig, along with others including the Controlling Persons, designed an investment scheme that served the interests of Lindberg and GGHI, to the detriment of the Plaintiff Insurance Companies, their policyholders, and their creditors.

96.    The overwhelming majority of insurance policies sold by the Plaintiff Insurance Companies were of the fixed obligation type:

      a.    Plaintiff SNIC primarily sold pre-need funeral insurance policies. These policies provide a contractually fixed payment amount at the time the insured dies.

      b.    Plaintiffs BLIC and CBL primarily sold Multi-Year Guaranteed Annuities, or "MYGAs." These policies provided a contractually fixed rate of return on the policyholder's investment over a period of time— typically three to seven years, with the majority expected to be withdrawn in five years.

97.    As such, the Controlling Persons were aware of the time period when Plaintiffs BLIC and CBL's investments would need to be converted to cash, in order to meet the contract-based, fixed obligations to annuity policyholders.

98.    The Controlling Persons were also aware of the actuarial forecasts prepared by Plaintiff Insurance Companies that showed when SNIC's investments would need to be converted to cash in order to meet the obligations to SNIC's policyholders who own pre-need funeral insurance policies.

99.    Rather than crafting an investment strategy to account for this most fundamental aspect of the Plaintiff Insurance Companies' business, the Controlling

Persons made no effort to align the incoming cash flows from the Plaintiff Insurance Companies' investments with their policyholder obligations.

100.   In December 2018, Plaintiff Insurance Companies' actuary determined that by 2023 Plaintiff Insurance Companies' obligations to policyholders would exceed the incoming cash flows from their investments by over $500 million.

101.   This problem of the misalignment of the investments' cash flows and Plaintiff Insurance Companies' policyholder obligations was exacerbated by the fact that the Plaintiff Insurance Companies' investments were typically in the form of either loans or preferred equity investments with limited redemption rights.

102.   Because the Plaintiff Insurance Companies' investments were in private placement loans, they could not easily go to a public market and quickly sell the loans to generate cash to meet policyholder obligations.

103.   For this reason, private placement loans are typically considered "illiquid"—meaning they cannot readily be converted to cash.

104.   Further compounding the problem with the illiquid nature of the loans— and highlighting the egregious conflicts of interest presented by Lindberg and Herwig controlling the investment decisions for both the Plaintiff Insurance Companies and Global Growth—is the fact that the Plaintiff Insurance Companies' affiliated investments were not accompanied by appropriate diligence and underwriting.

105.   Throughout the relevant period, the Plaintiff Insurance Companies' books and records lack evidence of meaningful diligence performed in connection with making loans to Lindberg-affiliated companies.

28

106.    Upon information and belief, the Controlling Persons and those working with them failed to do appropriate due diligence on the purchases of companies with the Plaintiff Insurance Companies' money.

107.    Accordingly, upon information and belief, the Plaintiff Insurance Companies were never provided diligence on these investments that was sufficient to establish that the loans were appropriate investments.

108.    Although the Board of Directors of each of the Plaintiff Insurance Companies (each a "Board" or, collectively, "Boards") was required to "approve" all investments, Lindberg and Herwig controlled and managed all investments made by the Plaintiff Insurance Companies and did so with little oversight from the Boards.

109.    In fact, on numerous occasions the Controlling Persons would buy or sell investments on behalf of the Plaintiff Insurance Companies and notify their Boards of the investments they had made after the fact—sometimes months after the investments were made.

110.    Using policyholder funds, the Controlling Persons went on a reckless spending spree of purchasing companies for Lindberg, including the Company Borrowers and dozens of other revenue-generating operating companies.

111.    Lindberg, Herwig, and GGHI structured the compensation for members of the mergers and acquisitions team at Global Growth based on the number and size of acquisitions.  As a result, these individuals were financially incentivized (1) to do as many acquisitions as possible and (2) to overpay for those acquisitions.

112. Defendants had no incentive to scrutinize the acquisitions or their prices because they were not the source of the acquisition funds. Plaintiff Insurance Companies had no ability to scrutinize the acquisitions or their prices because, as described above, Defendants purposely cut them out of the investment process, in violation of Plaintiff Insurance Companies' investment policies.

113. As a result, from 2014 to 2018 the insurance companies' spigot of cash was wide open, and Defendants greedily exploited the situation that they had created.

114. Between 2014 and 2018, the Controlling Persons spent billions of dollars of the Plaintiff Insurance Companies' policyholders' money to buy or fund the acquisition of approximately 60 companies for Lindberg.

115. The lending scheme that the Controlling Persons used to purchase companies for Lindberg created a "heads I win, tails you lose" situation, in which the Plaintiff Insurance Companies bore all the downside risk.

116. When the Plaintiff Insurance Companies entered into a loan agreement or a preferred equity agreement with limited redemption rights with Defendants, the "upside" of their investment was fixed—they were entitled only to the return articulated in the loan. If the company or companies that were purchased using the money loaned by the Plaintiff Insurance Companies became extremely valuable, the return to the Plaintiff Insurance Companies would be the same—the repayment terms set out in the loan.

117. On the other hand, if the Plaintiff Insurance Companies loaned money to a company or companies that did not perform well, they bore the risk of the loan

defaulting and not receiving repayment. The policyholders—the original source of the money loaned to the Defendants—would be left "holding the bag."

118.   By contrast—rather than using their own money—through the loans, the Defendants gained access to hundreds of millions of dollars of policyholder money that they used to acquire companies ultimately owned by Lindberg.

119.   If a company purchased using Plaintiff Insurance Company money became extremely valuable, then Lindberg would indirectly own that company and, unlike the insurance company that was the source of the purchase money, enjoy all of the "upside" benefits of the transaction.

120.   If the acquired company failed to perform well enough to service its debts—or simply chose not to service its debts—it would be Plaintiff Insurance Companies and their policyholders, not Lindberg, who would be out the cash.

121.   In the event of a loan default, the Plaintiff Insurance Companies would be left to seek repayment through the litigation process, which, for reasons detailed below, would likely prove unfruitful due to the multiple layers of shell companies—including the Shell Borrowers and dozens of other entities—that Defendants placed between the Plaintiff Insurance Companies and the operating companies that were purchased with their policyholders' funds.

122.   This wildly improper shift of risk allocation from Lindberg to the Plaintiff Insurance Companies' policyholders was exacerbated and obscured by the increasingly complex nature of the investment structure.

**False and Misleading Disaffiliation of Investments**

31

123. Over time, as they faced increasing pressure from regulators, the Controlling Persons caused the affiliated investments to be restructured in a variety of ways to make them appear to be disaffiliated from Lindberg and compliant with North Carolina law.

124. These various restructurings did not, in fact, create independent control or disaffiliation of the investments. At all relevant times, the Controlling Persons maintained complete control of the funds that originated from Plaintiff Insurance Companies' policyholders and the investment vehicles by which those funds were transferred to Lindberg's other companies.

125. The restructurings did, however, impair Plaintiff Insurance Companies' loan collateral, create opacity on the disposition of their loans, reduce their ability to be repaid, and create a vehicle for Defendants to charge excessive and unnecessary fees.

126. As described above, on information and belief, prior to December 2014, then-Insurance Commissioner Wayne Goodwin agreed to permit Lindberg, Herwig, and GGHI to invest no more than 40% of Plaintiff Insurance Companies' assets into "affiliates," as defined in N.C. Gen. Stat. § 58-19-5(1)—that is, companies under Lindberg's ultimate control.

127. On April 5, 2016, in response to the first annual financial statement submitted on behalf of Plaintiff SNIC, NCDOI advised Lindberg, Herwig, and GBIG Holdings that they were in violation of the 40% limit.

128. In response, the Controlling Persons engaged in a series of sham transactions to attempt to make the investments appear to NCDOI to be unaffiliated.

129. Between about July 2016 and January 2017, the Controlling Persons restructured Plaintiff Insurance Companies' loans to go through a series of intermediary shell entities described as Special Purpose Vehicles, or "SPVs." The SPV structure—in which the SPV, rather than a revenue-generating operating company, would be the direct borrower on each loan—appeared to create disaffiliation between the insurance company lender and the affiliate borrower by having a purportedly independent intermediary company hold all of the voting rights of the SPV.

130. In reality, the Controlling Persons created only the illusion of disaffiliation through the SPV structure. They maintained full control of both the lending and borrowing sides of the transaction.

131. GGHI negotiated an agreement with the partners of its own law firm to create a new entity—Edwards Mill Asset Management, LLC ("EMAM")—that would serve as the "independent" intermediary company that held the voting rights of the SPV.

132. EMAM, in fact, provided no independent governance. As such, its inclusion as an intermediary management company failed to disaffiliate the lending insurance companies from the borrowing affiliated companies.

133. When it became apparent that the SPVs did not, in fact, disaffiliate Plaintiff Insurance Companies' loans, the Controlling Persons moved to a new sham lending structure.

134. On or about January 10, 2017, Herwig wrote to NCDOI, copying Lindberg and Solow, explaining a proposed new "finance company investment structure [("FinCo")] to further reduce the percentage of SPVs on [the Plaintiff Insurance Companies'] balance sheet."

135. In his letter, Herwig represented, among other things, that:

a. The investments will be "investment grade loan[s] [from the Plaintiff Insurance Companies] to an unaffiliated investment company."

b. The FinCo "will have been contributed into a trust managed by an independent trustee with paid in capital..."

c. The FinCo "will have a contracted third party employee managing decisions and executing on behalf of the trustee;" that employee "has decades of experience in the middle market lending industry;" and that employee "will have the ability to buy and sell loans in order to generate income that will pay back the loan to the Finance Co. [FinCo]."

d. Lindberg "will have no control over the Finance Co. [FinCo]."

e. The FinCo "will have ample capitalization from its initial paid in capital."

f. The "structure will increase the credit quality of the portfolio by diversifying risk rather than having individual loans."

34

136. All of Herwig's above statements were false or materially misleading, as he well knew.

137. On or about January 16, 2017, Solow transmitted to NCDOI a second communication that contained more statements and representations about the FinCos that were materially false, fraudulent, and misleading, including that:

    a. Among the "Key Financing Rationale," that there was a "strong management team" with "decades of debt investment experience;"

    b. "All underlying investments will be middle market loans to private companies ..."

    c. The FinCo would be "capitalized with paid in capital and a bond offering;" and

    d. "The management of Lloyd Sams provides decades of middle market lending experience," and he was "able to efficiently manage the loan portfolio, assess credit quality and administer the debt."

138. Later, in or around October and November 2017, the Controlling Persons caused similar false and misleading statements to be submitted to a ratings agency, in an attempt to obtain a favorable rating for the investments so that their scheme could continue.

139. In truth and in fact, as Defendants well knew, the FinCo structure would provide none of these benefits.

140. For instance, on January 11, 2017, Lloyd Sams, who Solow days later represented to NCDOI would be the independent "management" of the FinCo entities,

told Solow and Herwig that he could not serve as a portfolio manager for the FinCos and was planning to provide only "credit monitoring and reporting."

141.   Based on Defendants' false and misleading representations, beginning in or around November 2017, the NCDOI permitted Defendants to transition Plaintiff Insurance Companies' investments from the SPVs to the newly-formed FinCos.  As a result, a FinCo, rather than an SPV, would become the direct borrower on each of the loans.

142.   Based on the false representation that the FinCos were "independently managed," Lindberg, Herwig, and GBIG Holdings caused Plaintiff Insurance Companies to represent in their 2017 year-end financials that 11% of SNIC's admitted assets were affiliated investments, 8% of CBL's admitted assets were affiliated investments, and 2% of BLIC's admitted assets were affiliated investments, which was far below true affiliated investment amounts.

143.   If the FinCos had been considered affiliated—as would have been accurate because they remained under Lindberg and GGHI's control—these financials would have shown that, as of the end of 2017, at least 52% of SNIC's admitted assets were affiliated investments, at least 38% of CBL's admitted assets were affiliated investments, and at least 4% of BLIC's admitted assets were affiliated investments.

144.   On January 10, 2018, a NCDOI regulator emailed GBIG's Chief Financial Officer ("CFO") a summary of his understanding of the FinCos and asked GBIG Holdings to let him know "if anything appears to be wrong or if I'm missing

something that is important." The summary emailed by the NCDOI regulator stated, among other things: "The finance company [FinCo] will be managed by a trust with an independent manager and compliance officer;" and "Additional capital support from preferred equity will be provided, if needed." GBIG Holdings replied to this summary with a "few comments," none of which suggested that NCDOI's understanding of the management of the FinCos was incorrect.

145. In fact, as the Defendants well knew, the regulator's understanding of the FinCos was incorrect—because Defendants had misled him, as well as the GBIG CFO.

146. The FinCos—including the Shell Borrower FinCos—provided no disaffiliation because the Controlling Persons remained in control of the Borrowers' operations—directing when, where, and how the FinCos would invest policyholder money that they had received from Plaintiff Insurance Companies.

147. On multiple occasions, Lindberg, Herwig, and Solow falsely and misleadingly caused Plaintiff Insurance Companies to submit to NCDOI and to release to the public reports and disclosures in which the investments in FinCos were falsely described as unaffiliated.

148. In sum, from 2016 through 2018, the Controlling Persons caused Plaintiff Insurance Companies' investments to flow through first sham SPV entities and then sham FinCo entities.

149. The stated justification for inserting these companies as intermediaries was to provide a layer of independent control, but in fact the intermediary borrower

entities—including the Shell Borrowers—were entirely under the Controlling Persons' control at all relevant times.

150. At the same time, Defendants caused the revenue-generating operating companies to become subsidiaries under multiple layers of shell holding companies, financing companies, and other non-revenue generating pass-through entities.

151. During 2016 through 2018, Defendants created a web of lending relationships between the SPVs, FinCos, and hundreds of other Lindberg-affiliated shell companies. Defendants caused Plaintiff Insurance Companies' loans and loans to borrowers further downstream to be transferred, divided, and combined among and between the various affiliated shell companies—at times conducting multiple loan transactions per day.

152. As a result, by June 2019, Plaintiff Insurance Companies' 32 loans to Lindberg-affiliated companies were routed and re-routed through over 500 intermediary shell companies, including the Shell Borrowers.

153. The Controlling Persons also directed the transfer of funds between affiliated companies with no legitimate business purpose. These transfers were recorded as intercompany balances and were rarely, if ever, completely repaid.

154. The unnecessarily complex investment structure also provided a mechanism through which Lindberg, Herwig, and others could charge service fees to Lindberg-affiliated companies for no legitimate business purpose.

155. For example, from 2014 through 2019, SFL received more than $300 million of fees from Lindberg-affiliated companies, including GGHI.

38

156. The services for which SFL collected those fees were actually performed by other Lindberg-affiliated companies, but SFL charged a significant markup to serve as a pass-through entity for collecting those fees.

157. This markup yielded SFL a profit of over $200 million.

158. Defendants knowingly and intentionally did not provide Plaintiff Insurance Companies with adequate information regarding the transactions that impacted their investments, resulting in Plaintiff Insurance Companies being unable to identify what they were truly invested in, much less to monitor adequately their investments' performance.

159. The internal loan transactions among Lindberg-affiliated companies had no legitimate business purpose and were done in furtherance of Defendants' fraudulent scheme.

160. Specifically, each of the subsequent financial transactions performed by each of the Shell Borrowers after they received money from the Plaintiff Insurance Companies involved the proceeds of the fraud scheme and were done in furtherance of the fraud scheme.

161. Through this fraudulent lending scheme, Lindberg purchased for himself dozens of operating company groups that, he claimed, produced $1.7 billion in revenue in 2022 and that GGHI claims are valued in excess of $5 billion.

162. However, because of Defendants' actions, Plaintiff Insurance Companies' loans are, with few exceptions, not to the revenue-generating operating companies directly, but instead are to shell borrowers whose only assets are

39

additional loans to further layers of shell borrowers. The remoteness of the revenue-generating operating companies from Plaintiff Insurance Companies' investments wrongfully shields Lindberg's valuable companies from any effort by Plaintiff Insurance Companies to collect on their loans.

163. Further, as part of the fraudulent lending scheme, Lindberg also directed certain policyholder funds to be routed through shell companies only to be returned to the Plaintiff Insurance Companies disguised as surplus contributions, which allowed the Defendants to access additional policyholder funds.

164. For example, Lindberg directed Plaintiff CBL to lend $30 million to CAM III. He subsequently directed the money to be transferred through another shell company to the parent company of CBL. The parent company then used the funds to make a surplus contribution to CBL, resulting in CBL recording both increased surplus and an asset of the investment for the same $30 million. In reality, Lindberg had caused CBL to transfer itself its own money by means of other Lindberg-controlled companies.

165. Regulations limit the policies an insurance company can write based on the proportion of its written premiums to its surplus. Therefore, not only did such transactions result in falsified financial reporting, but also they allowed the Controlling Persons to cause Plaintiff Insurance Companies to write additional policies and access more policyholder funds, continuing and deepening the overall fraudulent scheme.

40

## Use of Fraudulent Investment Structures to Steal Policyholder Funds

166.    The unlawful investment structure described above provided the vehicle not only for Lindberg to enrich himself through the acquisition of companies, but also to simply steal money from the Plaintiff Insurance Companies.

167.    From early 2016 through September 30, 2019, Lindberg took at least $50 million from various affiliated companies, including AFA, AAI, and Eli Research, LLC, and caused these transfers to be documented as "loans to shareholder" or other "receivables" from Lindberg's personal entities.

168.    These "loans" and "receivables" were not legitimate lending arrangements.  At the time Lindberg entered into these "loans" from the companies he owned and controlled, he had no intention of paying them back.

169.    The funds for these loans were not from the profits of the non-insurance operating companies that Lindberg ultimately owned and controlled, but rather were derived from Plaintiff Insurance Companies' policyholders.

170.    In this way, Lindberg was able to extract money from the Plaintiff Insurance Companies without having to comply with the restrictions on dividends and distributions to shareholders set out in N.C. Gen. Stat. § 58-7-130.

171.    Separately, from early 2017 through December 31, 2018, Lindberg also transferred more than $130 million for his personal use through various "loans" from various affiliated companies, some of which had originated from the Plaintiff Insurance Companies and were funneled through various pass-through entities before being transferred to Lindberg Entities.

172.    On October 31 and December 20, 2018, Lindberg caused the forgiveness of numerous loans from affiliated companies, totaling more than $100 million. Some of the entities that forgave loans, like AFA, CAM III, and CAF I, for example, had received loans directly from the Plaintiff Insurance Companies.

173.    The bulk loan forgiveness demonstrates that these "loans" were nothing more than sham transactions to allow Lindberg to extract money for his own use and benefit.

174.    Lindberg's extraction of these significant sums of money for his own use and benefit materially harms Plaintiff Insurance Companies' ability to be repaid on their loans to affiliated companies.

175.    The Controlling Persons also used the switch from SPV-borrowers to FinCo-borrowers as a means of extracting millions of dollars of policyholder funds for their own use and benefit.

176.    They did this by causing AFA to purchase the loans to the SPVs from the Plaintiff Insurance Companies at the insurance companies' carrying value, which was based on the (discounted) amount initially paid. They also caused the FinCos to use funds received from the Plaintiff Insurance Companies to purchase the underlying loans from the SPV at a substantially greater price which was based upon the par (or full) value of the loan. The SPVs then used those funds to repay AFA at the (higher) par value. These near-simultaneous transactions resulted in the Plaintiff Insurance Companies purchasing essentially the same underlying loans at a higher price, with AFA receiving the additional policyholder funds as a windfall.

42

177. The fraudulent extractions of Plaintiff Insurance Companies' funds generally proceeded as follows:

    a. AFA first bought a loan to a SPV from an insurance company at the book-adjusted carrying value, i.e., discounted price of the loan, plus accrued interest;

    b. The FinCos then borrowed from the Plaintiff Insurance Companies the funds to purchase the underlying loan previously held by the SPV in whole or part, at the par, i.e. full value, plus accrued interest; and

    c. The SPVs then sent to AFA the funds received from the FinCo, i.e., the par value of the loan, plus accrued interest.

    d. As a result, AFA "skimmed" the difference between the par value and discounted price of the loan off the top from the Plaintiff Insurance Companies—and, ultimately, their policyholders.

178. On or about November 9, 2017, a GGHI employee sent Lindberg a table showing "the breakdown of AFA's profit per Finco deal," indicating an anticipated total profit of nearly $51 million, with an average net profit per deal of more than $4.6 million across 11 FinCos.

179. On November 21, 2017, a GGHI employee sent Lindberg the "breakdown and total of AFA profit per FinCo deal we closed" between November 8 and November 17, 2017, showing a total of more than $27 million of insurance company money previously lent to the SPVs extracted from the FinCo transactions.

180.    Ultimately, as a result of the "AFA skim," Lindberg, Herwig, Solow, and GGHI extracted more than $57 million in the transition from SPVs to FinCos.

181.    Lindberg then used this money, in part, for personal expenditures including paying his credit card, renovating personal real estate, keeping up his private jet, throwing a $60,000 party in Las Vegas, chartering a $260,000 yacht trip in Ibiza, and surveilling women with whom Lindberg had or sought to have a personal relationship.

**Use of Fraudulent Investment Adviser to Steal Policyholder Funds**

182.    At the same time, Lindberg used a sham investment adviser that he created and controlled in order to extract further policyholder funds from Plaintiff Insurance Companies.

183.    In February 2016, Lindberg formed Standard Advisory Services, Ltd. ("SASL") for the purported purpose of providing investment advisory services to his affiliated companies, including the Plaintiff Insurance Companies.

184.    SASL, which is located in Malta, was registered with the SEC as an investment adviser from November 2016 to October 2019 and also obtained a license to provide investment advice from the Malta Financial Services Authority.

185.    Lindberg directed the Plaintiff Insurance Companies to use SASL as their investment adviser.

186.    At all relevant times, Herwig served as a director for SASL.

187.    At all relevant times, Lindberg served as a director for SASL.

188.   SASL agreed to provide investment advisory services to the Plaintiff Insurance Companies pursuant to written Investment Advisory Services Agreements. Among other things, SASL was retained to provide "securities investment advice" and to make "investment recommendations" regarding "securities," "securities assets," and/or "securities investments" to the Plaintiff Insurance Companies.

189.   In exchange for this advice, and pursuant to the Investment Advisory Services Agreements, Plaintiff Insurance Companies paid SASL advisory fees.

190.   Lindberg and Herwig, as agents of SASL, controlled the Plaintiff Insurance Companies' investments. They each had the authority to recommend, approve, direct, buy, and sell investments and securities on behalf of each of the Plaintiff Insurance Companies. They each were responsible for each of the Plaintiff Insurance Companies' overall investment management strategies and they each recommended the purchase and sale of securities on behalf of those entities.

191.   SASL owed a fiduciary duty to the Plaintiff Insurance Companies. SASL's fiduciary duty comprised both the duty of care and the duty of loyalty. SASL's fiduciary duty included the obligation to make full and fair disclosure of all material facts and to at all times act in the best interest of the Plaintiff Insurance Companies.

192.   SASL's fiduciary duty was memorialized in its policies and procedures and extended to all of its directors, officers, agents, and employees, including Lindberg and Herwig.

45

193. Lindberg, Herwig, and SASL routinely violated their fiduciary duties to the Plaintiff Insurance Companies.

194. As an initial matter, Lindberg, Herwig, and SASL failed to disclose their obvious and indefensible conflicts of interest to the Plaintiff Insurance Companies.

195. Lindberg, Herwig, and SASL regularly failed to undertake an adequate underwriting process on Plaintiff Insurance Companies' behalf.

196. Lindberg, Herwig, and SASL also failed to make full and fair disclosure of all material facts to Plaintiff Insurance Companies.

197. Moreover, Lindberg, Herwig, and SASL, all fiduciaries, repeatedly recommended and entered into transactions that were not disclosed to and were not in the best interests of the Plaintiff Insurance Companies and their policyholders.

198. As detailed above, Lindberg, Herwig, and SASL advised Plaintiff Insurance Companies to sell their interests in certain Lindberg-affiliated SPVs and then to re-purchase essentially the same investments through a different investment vehicle at a higher price, with Lindberg's company AFA pocketing the $57 million difference.

199. Adding insult to injury, SASL received over $15 million in fees for "advising" the Plaintiff Insurance Companies during the same time period that they engaged in the "AFA skim" transactions.

200. During the entire course of their fraud, SASL collected over $25 million in advisory fees from the Plaintiff Insurance Companies (through GBIG). These advisory fees were above market and unreasonable—even when compared to

investment advisers that provided legitimate services to their clients and did not defraud them.

201. At the direction of Lindberg and Herwig, SASL then doled out those advisory fees to and on behalf of the Controlling Persons and those working with them.

202. For example, in 2017, SASL made two unsecured loans totaling $17,900,000 to Lindberg-affiliated companies. Lindberg executed the loan agreements on behalf of SASL and signed the SASL resolution authorizing the loans.

203. In 2018, SASL made two additional unsecured loans totaling $16,816,695 to Lindberg-affiliated companies. Lindberg or Herwig executed each of the loan agreements on behalf of SASL and signed the SASL resolution authorizing the loans.

204. In total, as of December 31, 2018, SASL had made four unsecured loans to Lindberg-affiliated companies totaling $34,716,695.

205. All of these loans remain outstanding, though some have been transferred to another affiliated Malta-based company.

206. Lindberg also directed SASL to issue dividends to a shell parent company he owned totaling approximately $12.9 million.

   a. On December 20, 2018, SASL issued a dividend of $1,413,000.

   b. On January 10, 2019, SASL issued a dividend of $8,500,000.

   c. On April 12, 2019, SASL issued a dividend of $3,000,000.

47

207.   Herwig received annual salaries from SASL ranging from $947,000 to $1.6 million.

208.   Finally, and most egregiously, in one of the aforementioned 2018 loan transactions, $10.8 million of SASL's "profits" derived from policyholder funds and extracted from other Lindberg-affiliated companies upon information and belief was used—through a series of intermediary transactions—by Lindberg in 2018 to make the down payment on the purchase of a yacht named the "Double Down."

209.   Not only did the Plaintiff Insurance Companies not receive the services and duties that Lindberg, Herwig, and SASL owed them—the Plaintiff Insurance Companies were caused to pay these Defendants to steal from them.

210.   All of Lindberg, Herwig and SASL's conduct detailed above was in violation of their fiduciary duties to the Plaintiff Insurance Companies, their policyholders, and their creditors.

### Attempts to Bribe Insurance Commissioner

211.   With full knowledge of the financial fraud occurring within his companies, in 2018 Lindberg unlawfully attempted to bribe the North Carolina Insurance Commissioner to get him to replace the Senior Deputy Commissioner responsible for reviewing the financial condition of Plaintiff Insurance Companies.

212.   In November 2016, Insurance Commissioner Wayne Goodwin lost his reelection bid.   In January 2017, he was replaced by newly-elected Insurance Commissioner Mike Causey ("Commissioner").

48

213. On April 18, 2017, Lindberg attempted to contribute $10,000 to Mike Causey's campaign for reelection, but Commissioner Causey rejected Lindberg's contributions.

214. On November 20, 2017, Lindberg and others met with the Commissioner. During the meeting, Lindberg asked the Commissioner to call several insurance commissioners from other states where Lindberg was attempting to complete acquisitions to vouch for him. The Commissioner agreed to make those phone calls.

215. Later, one of Lindberg's representatives called the Commissioner to explain that Lindberg had contributed $500,000 to the North Carolina Republican Party, $110,000 of which was earmarked for the Commissioner. Lindberg's representative also stated that Lindberg wanted to host a fundraiser for the Commissioner.

216. Unbeknownst to Lindberg, in January 2018, the Commissioner contacted the Federal Bureau of Investigation to report that Lindberg and others were attempting to bribe him.

217. Over the course of the next seven months, the Commissioner participated in numerous conversations with Lindberg and others that were monitored by federal law enforcement officials.

218. During those conversations, Lindberg and his associates repeatedly complained to Commissioner Causey about issues with NCDOI, including the Senior Deputy Commissioner who was regulating them.

219. On or about March 5, 2018, at a secret meeting at the Statesville Regional Airport in Statesville, North Carolina, Lindberg offered to create an independent expenditure committee to support the Commissioner's re-election and fund it himself with $1 million to $2 million to resolve his issues with NCDOI.

220. Later, on or about May 16, 2018, when Commissioner Causey—who was working with law enforcement—asked about the status of the expenditure committee, Lindberg responded by asking about the replacement of the Senior Deputy Commissioner who was regulating them.

221. On or about May 29, 2018, Lindberg reiterated that if the Senior Deputy Commissioner was removed from regulating his companies, "We'll put the money in the bank."

222. On or about August 2, 2018, Lindberg's representative spoke with Commissioner Causey—who was still cooperating with law enforcement—to confirm receipt of Lindberg's first $250,000 payment and to inquire about the removal of the Senior Deputy Commissioner. On that call, Lindberg's representative said that the next $250,000 payment would occur when the Senior Deputy Commissioner was removed from regulating Lindberg's companies.

223. In furtherance of this scheme and artifice to defraud, Lindberg transmitted and caused to be transmitted by means of wire communication in interstate commerce the following transfers of funds:

50

| Date | Description |
|------|-------------|
| June 11, 2018 | Deposit of $500,000 from Lindberg in North Carolina Growth and Prosperity Committee Account |
| June 11, 2018 | Deposit of $1,000,000 from Lindberg in North Carolina Growth and Prosperity Committee Account |
| June 15, 2018 | Transfer of $10,000 from North Carolina State Republican Party to the Commissioner's campaign account |
| July 16, 2018 | Transfer of $10,000 from North Carolina State Republican Party to the Commissioner's campaign account |
| July 26, 2018 | Transfer of $230,000 from North Carolina State Republican Party to the Commissioner's campaign account |

224.    In the year 2018, the North Carolina Department of Insurance was a North Carolina state agency that received benefits in excess of $10,000 pursuant to a federal program involving a grant, contract, subsidy, loan guarantee, and other forms of federal assistance in that same year, in connection with any business, transaction, or series of transactions of such state government and agency involving something of value of $5,000 or more.

**Ignoring NCDOI's Direction to Decrease Affiliated Investments**

225.    While Lindberg was attempting to bribe his way to a friendlier regulator at NCDOI, his companies were blowing through the NCDOI's efforts to lower the level of affiliated investments.

226.    On May 2, 2018, Lindberg, on behalf of Plaintiff Insurance Companies, entered into a Remediation Plan with NCDOI.  Pursuant to the Remediation Plan, Lindberg agreed, among other things, that the Plaintiff Insurance Companies would

reduce the amount of their affiliated investments, including to limit their investments to "an aggregate amount of 10% of each company's admitted assets in the securities that [Lindberg] directly or indirectly maintains an economic interest in the direct or underlying borrower" by December 31, 2018.

227. Throughout May 2018, Plaintiff Insurance Companies' executives asked Herwig and Solow to stop "funding any more private loans" without a "documented plan to comply with the NCDOI MOU, specifically the 10% affiliated limit," that had just been agreed to in the Remediation Plan.

228. However, the Controlling Persons—who believed that Lindberg had reached an agreement to purchase a friendlier regulator—continued to fund loans to Affiliated Companies.

229. Specifically, in March 2018, the Controlling Persons created a new structure through which the existing affiliated loans to the FinCos would be "packaged" with a long-term note issued by a bank equal to the principal amount of the loans. This structure was called a "Principal Protected Note" or "PPN."

230. On or about May of 2018—after Defendants had already created 7 PPN structures—the NCDOI approved Defendants' use of the PPN structure to repackage the existing affiliated debt but noted that it should not be used in support of additional affiliated investments.

231. The Controlling Persons completely disregarded this limitation and immediately began using the PPN structure to "upsize" the loans to FinCos by injecting additional policyholder funds into them.

52

232. From March 2018 until July 2018, the Controlling Persons caused the creation of 13 PPN structures using policyholder funds for use in repackaging affiliated debt, in "upsizing" the FinCo loans, and for making new investments.

233. In an effort to gain more insight into and oversight of the investment of policyholder money by GGHI and to look better to NCDOI and other regulators, in the spring of 2018 Plaintiff Insurance Companies' executives sought to hire a Chief Investment Officer ("CIO") for Plaintiff Insurance Companies who was not affiliated with Lindberg's non-insurance companies. As a result of that process, on or about July 16, 2018, Plaintiff Insurance Companies hired a new CIO to replace Herwig.

234. In the week of August 20, 2018, disagreements between insurance company executives, on the one hand, and Herwig and Solow, on the other, with regard to how insurance company money could be invested and what constituted an affiliated investment, particularly in light of the Remediation Plan, came to a head.

235. This resulted in Herwig, as Lindberg knew, despite being removed as Plaintiff Insurance Companies' CIO, attempting to circumvent Plaintiff Insurance Companies' CFO and CIO to extract an additional $60 million from CBL to fund a new FinCo.

236. After learning that Herwig had initiated the transaction over their objection, the Plaintiff Insurance Companies' CFO cancelled the transaction, citing "a violation of our investment compliance policy and insurance regulation." After talking with Lindberg about the episode, Plaintiff Insurance Companies' CIO resigned.

53

237. Upon learning that Defendants had been using the PPN structure as a vehicle to make additional affiliated investments, by August 2018, NCDOI sent a letter to GBIG, Lindberg, and Herwig instructing them to cease any future affiliated investments, including into the PPN structures.

238. On October 2, 2018, local media outlets in North Carolina reported on the FBI investigation of Lindberg for unlawfully attempting to bribe the North Carolina Commissioner of Insurance.

239. In order to address concerns related to the financial condition of the Plaintiff Insurance Companies and the news of the federal investigation, on October 18, 2018, the Plaintiff Insurance Companies and the NCDOI entered a Consent Order for Administrative Supervision, under which the Plaintiff Insurance Companies consented to confidential administrative supervision pursuant to N.C. Gen. Stat. § 58-30-60 et seq.

240. The Controlling Persons caused Plaintiff Insurance Companies to represent in their 2018 year-end financials that 13% of SNIC's admitted assets were affiliated investments, 1% of CBL's admitted assets were affiliated investments, and 0% of BLIC's admitted assets were affiliated investments.

241. In reality, as of the end of 2018, at least 72% of SNIC's admitted assets were affiliated investments, at least 50% of CBL's admitted assets were affiliated investments, and at least 20% of BLIC's admitted assets were affiliated investments.

54

242. Through the administrative supervision, the NCDOI was unable to resolve the concerns regarding the Plaintiff Insurance Companies' ability to have sufficient long-term liquidity to meet their outstanding obligations.

243. The period of administrative supervision was extended by consent on February 5, 2019, and again on April 3, 2019.

244. The Second Amended Consent Order for Administrative Supervision established requirements for limiting the Plaintiff Insurance Companies' exposure to the affiliated investments, with the ultimate goal of reducing total affiliate exposure to approximately 10%.

245. The Second Amended Consent Order set forth a timeline for liquidating the affiliated debt, with intermediate "Trigger Dates" by which specified amounts of affiliate exposure were to be reduced.

246. If the Plaintiff Insurance Companies failed to reduce the affiliate exposure according to the timeline, they could purchase additional time to perform through a $30 million capital contribution. If they could not make the contribution, or if they made the contribution but still failed to reduce the exposure after an additional period, the companies agreed to consent to rehabilitation, the appointment of a receiver, and injunctive relief.

247. Pursuant to the Second Amended Consent Order, Lindberg and other GGHI officers purported to make efforts to: (1) sell the insurance companies; (2) refinance loans to the affiliates with third party lenders; and (3) sell the affiliated companies.

248. However, Lindberg and other GGHI officers working on his behalf represented that they were unable to find buyers willing to purchase the companies for their expected values.

249. Although Lindberg and other GGHI officers reported numerous attempts to refinance the debt, they also represented that they could reach no agreement with third parties willing to refinance a sufficient amount of the affiliate debt to meet the milestones set out in the Second Amended Supervision Order.

250. By the end of April 2018, the NCDOI had determined that the plan to liquidate the companies to resolve the outstanding debt obligations would result in a substantial shortfall of funds. In other words, the projected sales prices did not meet the companies' obligations.

251. The NCDOI calculated this shortfall as over $1.3 billion.

252. The NCDOI presented its analysis to GGHI officers, who could not refute its findings.

253. At the same time, the affiliated companies were having trouble financing their operating expenses.

254. The NCDOI already had been asked to approve a number of transactions that effectuated transfers of funds between affiliated companies to meet their operating expenses, rather than these entities supporting themselves through operating revenue.

255. In addition, on May 1, 2019, several affiliated companies failed to make payments on loan agreements, constituting events of default.

256. Because liquidation would result in a substantial shortfall on debt obligations, and because the operating companies also appeared to have acute financial problems, the NCDOI-appointed Administrative Supervisor, Mike Dinius, prepared an alternative plan to seek to achieve solvency instead of the immediate sale of affiliated companies.

257. Under Dinius's proposal: (1) the insurance companies would consent to rehabilitation immediately, (2) the identified operating companies would be moved temporarily under a new holding company under a board with a majority of independent directors, (3) the existing debt would be restructured among the operating companies and the new holding company, and (4) the operating companies would generate cash for debt reduction and long-term equity preservation. Once the affiliated loans were resolved, the companies could be returned to Lindberg's control.

258. During the spring of 2019, over the course of several weeks, the parties negotiated the terms of this agreement.

259. On June 27, 2019, the parties executed a contract titled "Memorandum of Understanding" ("MOU") that set out the plan to temporarily reorganize some of Lindberg's non-insurance companies under the governance of an independent board of directors until Plaintiff Insurance Companies' debt was repaid.

260. On the same day, Plaintiff CBL reduced to writing a loan to AFA that previously had been made in the amount of $15 million, increased the amount to $40 million, and structured the loan as a revolving line of credit ("Revolver"). The Plaintiff Insurance Companies also entered into an agreement granting Lindberg's

57

companies debt relief by lowering the interest rates on their loans and deferring repayment of the principal amounts ("Interim Amendment to Loan Agreements" or "IALA").

261. Also on June 27, 2019, with Lindberg's consent and as part of the overall transaction as described above, the Wake County Superior Court ("Rehabilitation Court") entered an Order of Rehabilitation.

262. The Order of Rehabilitation for the first time removed the Plaintiff Insurance Companies from Lindberg's control.

263. In connection with the Order of Rehabilitation, the Wake County Superior Court also issued an order directing a moratorium on policy surrenders, meaning that most of Plaintiff Insurance Companies' policyholders cannot access most of their investments during rehabilitation.

264. The purpose behind the moratorium is fairness: if policyholders were allowed to surrender their policies for cash in the ordinary course of business, the first policyholders would be paid but there would not be enough cash to pay later policyholders.

265. However, because the Defendants have failed to meet their obligations to the Plaintiff Insurance Companies during rehabilitation, the moratorium has been in place for four years, inflicting immeasurable hardship and stress on the innocent policyholders who, for the most part, still cannot access their funds.[4]

---

[4] The Rehabilitation Court has ordered all of the Plaintiff Insurance Companies into liquidation. However, while all of these entities are incontestably insolvent as a factual matter, Lindberg and GBIG Holdings frivolously have appealed these orders, further delaying the policyholders receiving relief.

## Defendants' Continuing Wrongful Conduct During Rehabilitation

266.   Although Lindberg has not been in control of the Plaintiff Insurance Companies since June 2019, he and the other Defendants have continued to act for their own benefit and to Plaintiffs' detriment.

267.   By October 2019, AFA had drawn down nearly all of the $40 million line of credit from Plaintiff CBL.  Over three years later, AFA still has still not repaid the line of credit, even after this Court entered a $51 million judgment based on AFA's breach of the agreement.  *See Colorado Bankers Life Ins. Co. v. Academy Financial Assets, LLC*, 5:20-CV-185 (E.D.N.C.).[5]

268.   Also by October 2019, Lindberg, GGHI, and others breached their obligations under the MOU agreement.  Over three years later, Lindberg and GGHI have still not performed the restructuring called for in the MOU, despite being ordered to do so in *Southland National Insurance Corp., et al. v. Lindberg, et al.*, 19-CV-13093 (Wake County Superior Court).[6]

269.   The Borrowers also have failed to make the required loan payments pursuant to the terms of the IALA, resulting in the Plaintiff Insurance Companies having to pursue repayment of their loans in over 30 civil cases in both state and federal court.

---

[5] On February 15, 2023, the United States Court of Appeals for the Fourth Circuit unanimously affirmed this Court's judgment in a published opinion.  See *Colorado Bankers Life Ins. Co. v. Academy Financial Assets, LLC*, 60 F.4th 148 (4th Cir. 2023).
[6] On June 20, 2023, the North Carolina Court of Appeals unanimously affirmed the trial court's judgment directing Lindberg, GGHI, and related companies to perform their obligations under the MOU, as well as the trial court's finding that these parties had defrauded Plaintiffs.

59

270.   In addition to these breaches of their agreements, Lindberg and GGHI have continued to inflict harm on the Plaintiff Insurance Companies, their policyholders, and their creditors by continuing to divert funds to their own personal or self-serving corporate uses in violation of court orders.

271.   At the outset of the litigation regarding the MOU agreement, Plaintiff Insurance Companies petitioned for and obtained a Temporary Restraining Order ("TRO") to prevent Lindberg and GGHI from dissipating assets or devaluing the companies whose ownership was at issue in that proceeding (the Specified Affiliated Companies or "SACs").

272.   On May 18, 2022, Special Deputy Rehabilitator Mike Dinius requested, pursuant to his audit powers, financial records from GGHI for the period from August 1, 2020 to April 30, 2022.  Despite having provided responsive information pursuant to an earlier, near-identical request in 2020, GGHI refused to provide the requested information.  On August 21, 2022, the Rehabilitation Court, over GGHI's objection, directed the records be produced no later than August 31, 2022.

273.   GGHI's financial records reveal that, between October 1, 2019 and April 30, 2022, almost $42 million of cash from GGHI has flowed to entities that Lindberg uses for personal expenses in order to avoid holding assets in his own name, including the Lindberg Entities. These cash payments were made for Lindberg's private jets ($5.3 million), his personal security team ($4.3 million), his megayacht ($3.4 million), and other companies he uses for personal expenses ($29 million).

274. These transfers to non-SACs that Lindberg uses for asset protection and personal expenses are, in and of themselves, violations of the TRO. Concerningly, GGHI's records indicate that over $12 million dollars of the funds transferred to these entities was generated by improper dividends from SACs or the improper use of funds from transactions that the court authorized under the TRO.

275. Also, during this time period GGHI made significant additional payments to benefit Lindberg, including:

    a. An additional $6.1 million for airplane-related expenses;

    b. $1.1 million for Lindberg's public-relations consultant;

    c. $26,000 for a ghost writer for Lindberg's self-published book, *633 Days Inside: Lessons On Life and Leadership*;

    d. $13,000 to maintain Lindberg's pool;

    e. $2000 to treat the fungus in Lindberg's lawn; and

    f. $2000 to fix the elevator at Lindberg's house.

276. While it may be difficult to ascertain the "ordinary business expenses" for a business whose business is fraud, these payments were unjustified, improper, and a violation of the Wake County Superior Court's orders.

277. Finally, it appears that tens of millions of GGHI expenses have been devoted to seeking to: (1) avoid its obligations to the Plaintiff Insurance Companies and other insurance companies; and (2) implementing its own "rehabilitation plan" in direct contempt of the Rehabilitation Court's prior orders. For example, GGHI has spent over $44 million in legal expenses and also paid $200,000 to an outside

company, Montshire Advisors, in connection with unauthorized and ultra vires efforts to sell the Plaintiff Insurance Companies.

## COUNT ONE
### Violation of 18 U.S.C. § 1962(c)
### (All Defendants)

278.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

279.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3), because each is "capable of holding a legal or beneficial interest in property."

280.    At all times relevant hereto, without Plaintiffs' knowledge or consent, the Defendants and others associated together to form an ongoing informal organization for the purposes of carrying out the wrongful activities set forth herein, and thus have constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4).

281.    As used herein, the term "Enterprise" shall refer to the association-in-fact enterprise consisting of the Defendants and others working with them to carry out the wrongful activities set forth herein.

282.    The Enterprise included entities that were subsidiaries of GGHI as well as entities that were not.  It included individuals who were associated with GGHI as well as those who were not GGHI's employees or agents.  The Enterprise engaged in and affected interstate and foreign commerce.

283.    From at least 2014 through 2023, the Enterprise joined together for a common purpose of defrauding Plaintiffs and others.

284. Each of the Defendants was employed by or associated with the Enterprise.

285. While each of the Defendants were employed by or associated with the Enterprise, the Enterprise and its purposes were distinct and separate from the Defendants.

286. The Enterprise consisted of the companies operating under the trade name of "Eli Global" and later "Global Growth," as well as individuals employed by one or more of these companies, in addition to other individual and entities named and unnamed as Defendants in this action.

287. Each of the Defendants conducted or participated in, directly or indirectly, the conduct of the Enterprise's affairs.

288. Each Defendant's participation was through a pattern of racketeering activity.

289. Each Defendant benefitted from the infusion of racketeering income and knowingly agreed to facilitate the scheme of the RICO Enterprise.

290. The racketeering activity, as that term is defined in 18 U.S.C. § 1961(1), referred to above includes, but is not limited to, the following predicate offenses:

A. Engaging in wire fraud, in violation of 18 U.S.C. § 1343 (All Defendants): Defendants, willfully and knowingly and with the intent to defraud, having devised a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, participated in a scheme to defraud Plaintiff Insurance Companies:

1. As part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' policyholder funds into investments that were improper for Plaintiff Insurance Companies and their policyholders.

63

2. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles that were inadequately collateralized.

3. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles that were illiquid and difficult to liquidate.

4. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles whose duration did not match the timing of Plaintiff Insurance Companies' obligations to policyholders.

5. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles that were presented to the insurance companies' officers and board members only after the transaction was completed.

6. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles that avoided insurance company oversight by directing these investments through multiple layers of intermediary companies and syndications without providing Plaintiff Insurance Companies adequate disclosures regarding these subsequent transactions.

7. As a further part of this scheme to defraud, Defendants knowingly placed Plaintiff Insurance Companies' investments into vehicles that avoided insurance company oversight by placing Defendants Lindberg and Herwig on Plaintiff Insurance Companies' Investment Committees.

8. As a further part of this scheme to defraud, Defendants knowingly extracted fees that were unwarranted and inappropriate from these investment transactions to the benefit of Defendants.

9. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and Solow knowingly misrepresented the independence of the recipients of Plaintiff Insurance Companies' investments to insurance regulators.

10. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and Solow knowingly misrepresented the capitalization of recipients of investments to insurance regulators.

11. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and Solow knowingly misrepresented the due diligence process for Plaintiff Insurance Companies' investments.

12. As a further part of this scheme to defraud, Defendants GGHI, Lindberg, and Herwig knowingly compensated their mergers and acquisitions personnel based in part on the size and number of transactions, creating an incentive to enter into more transactions and to overpay for transactions instead of prudently investing Plaintiff Insurance Companies' funds.

13. As a further part of this scheme to defraud, Defendants knowingly and without business justification sold and resold affiliated investments within the enterprise to generate additional fees to the benefit of Defendants.

14. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and SASL knowingly diverted Plaintiff Insurance Companies' funds to a sham investment adviser that Defendants owned and controlled.

15. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and SASL knowingly directed Plaintiff Insurance Companies to overpay the sham investment adviser that Defendants owned and controlled.

16. As a further part of this scheme to defraud, Defendants Lindberg, Herwig, and SASL knowingly failed to undertake an adequate underwriting process on Plaintiff Insurance Companies' behalf.

17. As further part of this scheme to defraud, for the reasons set forth above, the sham investment adviser that Defendant Lindberg owned and controlled and for which Defendant Herwig was a director and officer breached its fiduciary duties to Plaintiff Insurance Companies.

18. As a further part of this scheme to defraud, Defendants knowingly directed circular transactions where funds that originated from Plaintiff Insurance Companies ultimately flowed back to their parent companies, creating the false illusion of increased capitalization of Plaintiff Insurance Companies and increased Plaintiff Insurance Companies' reported surplus in order to facilitate the additional sale of policies to keep cash flowing into the scheme.

19. As further part of this scheme to defraud, Defendants GGHI, Lindberg, and Herwig knowingly directed Plaintiff Insurance Companies to promise at or near the top of market annuity yields to prospective investors to induce them to purchase annuities to keep cash flowing into the scheme.

20. As further part of this scheme to defraud, Defendants knowingly directed investments from Plaintiff Insurance Companies to non-revenue producing companies owned and controlled by Defendants GGHI and Lindberg with the goal and effect of evading the restrictions on dividends from Plaintiff Insurance Companies to their shareholder.

21. As further part of this scheme to defraud, Defendants knowingly extracted unwarranted and unreasonable management fees to Defendants' personal use and benefit.

22. As further part of this scheme to defraud, Defendants knowingly diverted investment funds to Defendants' personal use and benefit.

23. As further part of this scheme to defraud, Defendants Lindberg, Herwig, and Solow knowingly misrepresented material facts and knowingly omitted material facts in disclosures to their regulator and to personnel at Plaintiff Insurance Companies who were not part of Defendants' scheme.

24. These actions, when taken collectively and under the circumstances as set forth in more detail in this Complaint and as to be proven at trial of this matter, constitute a scheme and artifice to defraud Plaintiffs.

25. In furtherance of this scheme and artifice to defraud Plaintiffs, Defendants then transmitted or caused to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, as detailed in this Complaint as well as in Exhibit A to this Complaint, which is incorporated by reference herein. Each of the Company Borrowers or Shell Borrowers came to be a borrower from Plaintiffs through the transactions set forth in Exhibit A or through subsequent transactions of these funds, which also made use of wire, radio, or television communications in interstate or foreign commerce.

66

Defendants did so with an intent to defraud Plaintiffs. For the purpose of executing and attempting to execute the scheme and artifice, Defendants caused to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, Defendants sent and caused to be sent in interstate commerce the electronic communications and electronic financial transactions described above in furtherance of the scheme to defraud detailed in the allegations above.

B.  <u>Engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 (All Defendants):</u> Defendants devised, attempted to execute, and executed a scheme to defraud Plaintiff Insurance Companies and their policyholders by controlling and managing Plaintiff Insurance Companies' reserves to the detriment of Plaintiff Insurance Companies and their policyholders and to the benefit of Defendants, and making use of the wires in furtherance of that scheme in violation of 18 U.S.C. § 1343, as set forth above, thereby engaging in "specified unlawful activity" within the meaning of 18 U.S.C. § 1956(7)(D). Defendants then knowingly engaged in, and caused to occur, monetary transactions in property derived from the wire fraud violations of a value greater than $10,000 in violation of 18 U.S.C. § 1957, as detailed in this Complaint as well as in Exhibit B to this Complaint, which is incorporated by reference herein.

C.  <u>Engaging in bribery in violation of 18 U.S.C. § 666(a)(2) (Defendants Lindberg and GGHI):</u> Defendants Lindberg and GGHI violated 18 U.S.C. § 666(a)(2) by corruptly giving, offering, and agreeing to give a thing of value, and attempting to do so, to any person intending to influence and reward an agent of the NCDOI, a State agency that received benefits in excess of $10,000 pursuant to a Federal program involving a grant, contract, subsidy, loan guarantee, and other forms of Federal assistance in 2018, in connection with any business, transaction, or series of transactions of such State government and agency involving something of value of $5,000 or more. Namely, Defendant Lindberg gave, offered, and agreed to give $2 million in campaign contributions and through an independent expenditure committee to the Commissioner of Insurance, a public official of the State of North Carolina, intending to influence and reward the Commissioner of Insurance in connection with the transfer of the Senior Deputy Commissioner, as detailed in this Complaint.

291.  The Defendants engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), as identified in the preceding paragraphs. The Defendants' racketeering activities have continuity as they occurred over a prolonged period of

67

time (2014 through 2023) and continued as a regular part of the Defendants' business practice.

292.    The Defendants' acts of racketeering activity are related, as they share a common purpose, participants, victims, and result, and method of commission, and are not isolated events.

293.    The Enterprise engaged in the unlawful acts described above as well as lawful business acts.

294.    As a direct and proximate cause of the Defendants' actions, Plaintiffs have been injured, and continue to be injured, in their business or property by reason of the violations of 18 U.S.C. § 1962 in an amount to be proven at trial.

295.    By reason of these RICO violations, Plaintiffs are entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

## COUNT TWO
### Violation of 18 U.S.C. § 1962(a)
### (All Defendants)

296.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

297.    Each of the Defendants participated in the pattern of racketeering set forth above.

298.    Defendants are persons who received income from the pattern of racketeering set forth above.

299. Defendants each invested or used all or part of that income in the establishment, operation, and maintenance of the Enterprise.

300. The Enterprise was engaged in and affected interstate and foreign commerce.

301. Plaintiffs' business and property was injured by reason of each Defendant's use or investment of their income in the Enterprise in an amount to be proven at trial.

**COUNT THREE**
**Violation of 18 U.S.C. § 1962(b)**
**(Defendants Lindberg, Herwig, Solow, GGHI, SASL, EMAM, AFA,**
**and GBIG Holdings)**

302. Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

303. Defendants Lindberg, Herwig, Solow, GGHI, SASL, EMAM, AFA, and GBIG Holdings, through the pattern of racketeering set forth above, acquired or maintained an interest in or control of the Enterprise described above.

304. Each of Defendants Lindberg, Herwig, Solow, GGHI, SASL, EMAM, AFA, and GBIG Holdings' interest or control of the Enterprise was associated with and connected to the pattern of racketeering activity.

305. The Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

306. Plaintiffs' business and property was injured by reason of each of Defendants Lindberg, Herwig, Solow, GGHI, SASL, EMAM, AFA, and GBIG

Holdings' acquisition or maintenance of the interest in or control over the Enterprise in an amount to be proven at trial.

**COUNT FOUR**
**Conspiracy to Commit Racketeering (Federal)**
**(All Defendants)**

299.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

300.    In violation of 18 U.S.C. § 1962(d), Defendants and other known and unknown persons have conspired with each other to violate 18 U.S.C. § 1962(a), (b), and (c).

301.    The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiff Insurance Companies and others by means of a scheme to defraud.  By these misappropriations, Defendants gained personal benefits and supported their fraudulent scheme.

302.    Defendants agreed and combined with persons known and unknown to engage in a pattern of racketeering activity.  Defendants, through their words and actions, each agreed to commit two or more predicate acts of wire fraud, money laundering, and bribery, as alleged above, in furtherance of their scheme to protect the fraud scheme. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above.

303.    Defendants' agreement can reasonably be inferred from their close professional ties and from their mutually dependent, coordinated efforts in achieving the objectives of the enterprise.

70

304.    The predicate acts of wire fraud, money laundering, and bribery, described above, constitute overt acts of the foregoing conspiracy, in violation of 18 U.S.C. § 1962(d), by reason of which Plaintiffs have suffered a loss as set forth herein.

305.    Plaintiffs are entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

**COUNT FIVE**
**Racketeering (North Carolina)**
**(All Defendants)**

306.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

307.    By their activities set forth herein, the Defendants engaged and participated in conduct in violation of certain federal laws, as set forth above.

308.    The Defendants participated in, aided and abetted, and conspired to commit activities in violation of N.C. Gen. Stat. § 75D-1, et seq.

309.    At all times relevant hereto, without Plaintiffs' knowledge or consent, the Defendants and others associated together to form an ongoing informal organization for the purposes of carrying out the wrongful activities set forth herein, and thus have constituted an association-in-fact "enterprise" within the meaning of that term as used in N.C. Gen. Stat. § 75D-3(a).

310.    As used herein, the term "Enterprise" shall refer to the association-in-fact enterprise consisting of the Defendants and others working with them.

311.    The Enterprise functioned continuously during the relevant time and, upon information and belief, continues to function.

312. At all times relevant to this action, each Defendant was, and each still is, a "person" within the meaning of the North Carolina Racketeer Influenced and Corrupt Organizations ("NC RICO") Act, N.C. Gen. Stat. § 75D-1, *et seq*.

313. During the relevant times, in connection with the activities giving rise to this action, the Defendants conspired with each other, and with others, to engage in, and did engage in, various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by 18 U.S.C. §§ 666, 1343, 1957 and N.C. Gen. Stat. § 14-218.

314. The acts of wire fraud, money laundering, and bribery constituted acts of "racketeering activity" within the meaning of that term as used in N.C. Gen. Stat. § 75D-3(c).

315. The racketeering activity described above occurred repeatedly, continuously, and without interruption from on or about 2014 until 2023.

316. The acts of racketeering activity alleged above have sufficient continuity and relationship to constitute a "pattern of racketeering activity" within the meaning of N.C. Gen. Stat. § 75D-3(b).

317. The Defendants have through the pattern of racketeering activity referred to herein acquired and maintained, directly and indirectly, an interest or control of the Enterprise, in violation of N.C. Gen. Stat. § 75D-4(a)(1).

318. The Defendants conducted and participated in the Enterprise, directly and indirectly, through the above-described pattern of racketeering activity in violation of N.C. Gen. Stat. § 75D-4(a)(2).

319.   The Defendants agreed and conspired among themselves to violate N.C. Gen. Stat. § 75D-4(a)(1) and (2) in violation of N.C. Gen. Stat. § 75D-4(a)(3).

320.   The violations of N.C. Gen. Stat. § 75D-4(a)(1), (2), and (3) have proximately caused Plaintiffs injury and harm in their business and property in an amount to be determined at trial in this matter.

321.   In accordance with N.C. Gen. Stat. § 75D-8(c), Plaintiffs, concurrently with the filing of this Complaint, will notify the Attorney General of North Carolina in writing of the commencement of this action.

**COUNT SIX**
**Constructive Fraud Arising from Breach of Fiduciary Duty**
**(Defendants Lindberg and Herwig)**

322.   Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

323.   From 2014 to 2018, Defendants Lindberg and Herwig served as Directors of the Plaintiff Insurance Companies.

324.   As Directors, Defendants Lindberg and Herwig were each in a relationship of trust and confidence in relation to Plaintiffs.

325.   Accordingly, Defendants Lindberg and Herwig owed fiduciary duties to Plaintiffs that included, among other things, the obligation not to self-deal or to otherwise misuse and waste assets derived from policyholder premiums.

326.   As detailed above, Defendants Lindberg and Herwig took advantage of their relationship of trust and confidence with Plaintiffs by investing the Plaintiff Insurance Companies' assets in a manner that benefitted the Defendants and their affiliates and harmed the Plaintiffs.

73

327.    Defendants Lindberg and Herwig acted intentionally, willfully, wantonly, fraudulently, and with malice in breaching their fiduciary duties to Plaintiffs.

328.    As a direct and proximate result of the Defendants' actions the Plaintiffs have been harmed and have suffered compensatory damages in an amount to be proven at trial.

329.    Because Defendants Lindberg and Herwig acted intentionally, willfully, wantonly, fraudulently, and with malice in breaching their fiduciary duties, Plaintiffs also are entitled to an award of punitive damages in an amount to be proven at trial.

**COUNT SEVEN**
**Constructive Fraud Arising from Breach of Fiduciary Duty**
**(Defendants Lindberg, Herwig, and SASL)**

330.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

331.    From 2016 to 2019, Defendants Lindberg, Herwig, and SASL served as investment advisers to the Plaintiff Insurance Companies.

332.    As investment advisers, Defendants Lindberg, Herwig, and SASL were each in a relationship of trust and confidence in relation to Plaintiffs.

333.    Accordingly, Defendants Lindberg, Herwig, and SASL owed fiduciary duties to Plaintiffs not to self-deal or to otherwise misuse and waste assets derived from policyholder premiums.

334.    As detailed above, Defendants Lindberg, Herwig, and SASL took advantage of their relationship of trust and confidence as investment advisers to the

Plaintiff Insurance Companies by advising them to invest their assets in a manner that benefitted the Defendants and their affiliates and harmed Plaintiffs.

335.    Defendants Lindberg, Herwig, and SASL, further directed the payment of advisory fees from the Plaintiff Insurance Companies to SASL as compensation for the unlawfully rendered, self-dealing, investment advice that Defendants Lindberg, Herwig, and SASL provided.

336.    Defendants Lindberg, Herwig, and SASL acted intentionally, willfully, wantonly, fraudulently, and with malice in breaching their fiduciary duties to Plaintiffs.

337.    As a direct and proximate result of the Defendants' actions the Plaintiff Insurance Companies have been harmed and have suffered compensatory damages in an amount to be proven at trial.

338.    Because Defendants Lindberg, Herwig, and SASL acted intentionally, willfully, wantonly, fraudulently, and with malice in breaching their fiduciary duties, Plaintiffs also are entitled to an award of punitive damages in an amount to be proven at trial.

### COUNT EIGHT
### Civil Conspiracy
### (All Defendants)

339.    Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

340.    Defendants entered into an agreement to constructively defraud the Plaintiffs.

75

341. As set forth above, Defendants' agreement was made pursuant to the common scheme. The Defendants engaged in a common scheme and understanding with others, either express or implied, in which they took advantage of their position of trust and confidence by investing the Plaintiff Insurance Companies' assets in a manner that benefitted the Defendants and their affiliates and harmed the Plaintiffs.

342. Defendants have an independent personal financial stake in the object of the conspiracy, in that—as alleged herein—they invested the assets into investments through which they stood to benefit themselves.

343. Accordingly, all Defendants should be held jointly and severally liable for Plaintiffs' injuries resulting from this conspiracy.

## COUNT NINE
## Unfair and Deceptive Trade Practices under N.C. Gen. Stat. § 75-1.1
## (All Defendants)

344. Plaintiffs incorporate each and every allegation above as if set forth fully and verbatim herein.

345. At all relevant times, each of the Defendants was engaged in commerce as defined by Chapter 75 of the North Carolina General Statutes.

346. The wrongful conduct of the Defendants, as alleged above—including racketeering, conspiracy to engage in racketeering, constructive fraud, and civil conspiracy—constitutes unfair or deceptive acts or practices, which has injured and will continue to injure Plaintiffs and which has resulted and will continue to result in damages to Plaintiffs.

347. As a direct and proximate result of this unfair and deceptive conduct, Plaintiffs have been damaged and are entitled to a judgment against the Defendants

76

for actual damages, and those damages are to be automatically trebled pursuant to N.C. Gen. Stat. § 75-16. Plaintiffs also are entitled to an award of attorney fees pursuant to N.C. Gen. Stat. § 75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

A. Enter judgment for Plaintiffs on their causes of action against Defendants;

B. Grant Plaintiffs a trial by jury on all issues so triable;

C. Award Plaintiffs their actual damages against Defendants in an amount over $1,000,000,000 to be proven at trial;

D. Treble Plaintiffs' actual damages against Defendants pursuant to North Carolina and federal law;

E. Award Plaintiffs punitive damages against Defendants pursuant to North Carolina and federal law;

F. Award Plaintiffs pre- and post-judgment interest against Defendants on each of their causes of action in which they recover damages;

G. Award Plaintiffs their costs and fees, including attorneys' fees, against Defendants as allowable by law including 18 U.S.C. § 1964(c), N.C. Gen. Stat. § 75D-8(c), and N.C. Gen. Stat. § 75-16.1;

H. Order Defendants to divest themselves of any interest they hold, directly or indirectly, in the Enterprise, pursuant to 18 U.S.C. § 1964(a) and N.C. Gen. Stat. § 75D-8(a)(1);

I.      Order Defendants to cease engaging in the same type of endeavor as the Enterprise has engaged in, as articulated in this Complaint, pursuant to 18 U.S.C. § 1964(a) and N.C. Gen. Stat. § 75D-8(a)(2);

J.      Order the dissolution or reorganization of the Enterprise and its constituent entities, including the Defendants, making due provision for the rights of innocent persons, pursuant to 18 U.S.C. § 1964(a) and N.C. Gen. Stat. § 75D-8(a)(3); and

K.      Grant such other and further relief as this Court deems just and proper.

Respectfully submitted, this the 23rd day of June, 2023.

WILLIAMS MULLEN

/s/ Wes J. Camden
Wes J. Camden
N.C. Bar No: 33190
wjcamden@williamsmullen.com

/s/ Caitlin M. Poe
Caitlin M. Poe
N.C. Bar No.: 44713
cpoe@williamsmullen.com

301 Fayetteville Street, Suite 1700 (27601)
PO Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
*Attorneys for Plaintiffs*

78