IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-340-D-RN

SOUTHLAND NATIONAL INSURANCE                    )
CORPORATION in Liquidation; BANKERS LIFE        )
INSURANCE COMPANY in Rehabilitation;            )
COLORADO BANKERS LIFE INSURANCE                 )
COMPANY in Rehabilitation; and the SPECIAL      )
DEPUTY REHABILITATORS of COLORADO               )
BANKERS LIFE INSURANCE COMPANY and              )
BANKERS LIFE INSURANCE COMPANY and              )
the SPECIAL DEPUTY LIQUIDATORS of               )
SOUTHLAND NATIONAL INSURANCE                    )
CORPORATION, on behalf of both the              )
policyholders and creditors of each of these    )
insolvent companies,                            )
                                                )
                    Plaintiffs,                 )
                                                )
        v.                                      )
                                                )
GREG E. LINDBERG, *et al.*                       )
                                                )
                    Defendants.                 )

**RESPONSE IN OPPOSITION TO PARTIAL MOTION TO DISMISS**

Plaintiffs Southland National Insurance Corporation ("SNIC"), Bankers Life

Insurance Company ("BLIC"), Colorado Bankers Life Insurance Company ("CBL")

(collectively, the "Plaintiff Insurance Companies"), the Special Deputy Rehabilitators

of BLIC and CBL, and the Special Deputy Liquidators of SNIC on behalf of their

policyholders and creditors (the "SDRs;" together with the Plaintiff Insurance

Companies, "Plaintiffs"), hereby respond in opposition to Defendants Greg E.

Lindberg; Global Growth Holdings, Inc.; Academy Financial Assets, LLC; Alpharetta,

LLC; AR Purchasing Solutions, LLC; AR Purchasing Solutions 2, LLC; ComplySmart, LLC; Augusta Asset Management, LLC; Baldwin Asset Management, LLC; Capital Assets Fund I, LLC; Capital Assets Fund II, LLC; Capital Assets Fund IV, LLC; Capital Assets Fund V, LLC; Capital Assets Management II, LLC; Capital Assets Management III, LLC; Chatsworth Asset Management, LLC; CV Investments, LLC; Damascus Asset Management, LLC; Ephesus Asset Management, LLC; Forest Park Asset Management, LLC; GBIG Holdings, LLC; Gilford Asset Management, LLC; Hampton Asset Management, LLC; HPCPS Investments, LLC; Iron City Asset Management, LLC; iTech Funding, LLC; Jackson Asset Management, LLC; Kite Asset Management, LLC; Lilly Asset Management, LLC; Marshall Asset Management, LLC; Paradise Asset Management, LLC; Rockdale Asset Management, LLC; Summerville Asset Management, LLC; and Tybee Island Asset Management, LLC's (collectively, "Defendants") Partial Motion to Dismiss the Amended Complaint [D.E. 43, 44].

## Nature of Matter Before the Court

Over the course of approximately five years, Defendant Greg Lindberg ("Lindberg") and others working with him looted $1.2 billion of policyholder funds from the Plaintiff Insurance Companies. With this money, representing funeral policies, retirement plans, and the hard-earned life savings of innocent people, Lindberg bought himself companies operating in a variety of industries; purchased homes in Key West, Idaho ski country, and the then-largest residential real estate sale in Wake County history; and leased private jets and a superyacht named the

"Double Down"—an acquisition made after he was indicted for attempting to bribe the North Carolina Insurance Commissioner.

Lindberg orchestrated this fraud through the use of dozens of knowing and unknowing associates and hundreds of actual and shell companies. The Defendants' fraudulent conduct was intermixed with actual legitimate business activity—the non-insurance operating companies that Lindberg bought with policyholder funds, for instance, were not active participants in the Defendants' scheme. The wide-ranging nature of the scheme has imperiled the investments of hundreds of thousands of innocent policyholders across the country and has resulted in one of the largest insurance company insolvencies in this nation's history. This situation is the exact scenario for which application of the Racketeer Influenced and Corrupt Organizations ("RICO") Act is appropriate.

Defendants argue that Plaintiffs have failed to allege adequately their claims under federal civil RICO and North Carolina law. In reality, the Amended Complaint sets forth with great detail how Lindberg and his co-conspirators took control of Plaintiff Insurance Companies' policyholder money, used that money for their own benefit, and hid their scheme from regulators through misrepresentations and, eventually, an effort to buy that regulator off. Even after the Plaintiff Insurance Companies were removed from Lindberg's control, he and his associates continued to take money that should have been used to repay policyholders for their own wrongful purposes, in defiance of court orders. For the reasons set forth below, Plaintiffs'

3

allegations meet the applicable standards, and this Court should deny Defendants'
Partial Motion to Dismiss.

## **Statement of Facts**

Plaintiff Insurance Companies are insurers that sold, among other products, annuities—investments in which a policyholder makes an initial upfront payment and in exchange receives a guaranteed rate of return over a period of years (here, typically five or seven years). Am. Compl. ¶ 97. In what should have been an effort to achieve this return, each of the Plaintiff Insurance Companies took the policyholder payments (or "premiums") and invested them. *Id.* at ¶ 58. For the protection of policyholders and to make sure they receive the benefit of their policies, insurers' investments are subject to state regulation. *See id.* at ¶¶ 64-67. Here, at the relevant times, the North Carolina Department of Insurance ("NCDOI") was the Plaintiff Insurance Companies' primary regulator. *See id.* at ¶ 70.

Between 2014 and 2017, Lindberg acquired the three Plaintiff Insurance Companies and redomesticated them to North Carolina. *Id.* at ¶¶ 73, 79. Lindberg, along with co-conspirators including Defendants Chris Herwig ("Herwig") and Devin Solow ("Solow"), then began carrying out a scheme to use Plaintiff Insurance Companies' policyholder premiums for his own personal benefit. These individuals and others worked individually and with companies including GBIG Holdings, LLC ("GBIG Holdings"), the Plaintiff Insurance Companies' parent company; Global Growth Holdings, Inc. ("GGHI"), the main parent company for Lindberg's non-insurance companies; Standard Advisory Services Limited ("SASL"), a registered

4

investment adviser based in Malta that Lindberg created; Edwards Mill Asset Management, LLC ("EMAM"), a company that falsely created the appearance of independent control of Plaintiffs' investments; and Academy Financial Assets, LLC ("AFA"), an entity the Defendants used as a cash conduit among the various companies and for themselves (these entities, along with Herwig and Solow, "Controlling Persons"). *See id.* at ¶¶ 6-11. These individuals and companies were the primary actors who devised, carried out, and directed the activities in furtherance of the overall scheme. However, the scheme also involved numerous other individuals and companies, who participated in the conduct at issue with varying levels of knowledge and culpability. *See id.* at ¶¶ 46-50.

At its core, the scheme was a plan to place policyholder premiums into improper investments that would benefit Lindberg and his colleagues while improperly shifting the risk of business failure onto Plaintiff Insurance Companies and their policyholders. *Id.* at ¶ 85. These investments, whose terms were entirely controlled by Lindberg and those working with him, were too risky, too hard to turn into cash, and not structured to meet Plaintiff Insurance Companies' obligations to policyholders and others as they came due. *See id.* at ¶¶ 101-07. Although Lindberg and those working with him created various architectures over time to make it appear that there was some independent oversight on these investments, in reality he and Herwig exercised complete control over them at all times. *See id.* at ¶¶ 109, 124-49. Lindberg and his co-conspirators caused Plaintiff Insurance Companies to enter into

5

a series of investments that, the insurer's actuary found in 2018, would lead to a shortfall of $500 million in payments to policyholders by 2023. *Id.* at ¶ 101.

Along the way, Lindberg and the other Controlling Persons also simply extracted funds for their own use and benefit, in addition to all of the companies that they purchased for Lindberg using policyholder funds. For instance, the Controlling Persons caused the shell companies to enter into hundreds of transactions among themselves, generating service fees that they paid themselves with money that could have repaid policyholders. *Id.* at ¶ 155. The Controlling Persons also devised a scheme where a loan restructuring generated over $50 million of "profit" to one of Lindberg's companies—despite providing no value to the lenders. *Id.* at ¶ 177-80. Lindberg and others working with him also created an overseas investment advisory firm, SASL, that he and Herwig caused the Plaintiff Insurance Companies to pay tens of millions of dollars in advisory fees. *Id.* at ¶ 201. SASL provided Plaintiff Insurance Companies with no valuable investment advisory services, and instead "advised" them to enter into more improper investments into Lindberg-controlled entities. *Id.* at ¶ 210. Finally, and most directly, Lindberg caused over $180 million of "loans" and other transfers to be made to him or for his use out of his non-insurance companies. *Id.* at ¶¶ 168, 172. Toward the end of 2018, Lindberg caused over $100 million of these "loans" to be forgiven without repayment—demonstrating that these transactions were mere shams for him to extract funds for his own use. *Id.* at ¶¶ 173-74.

The Controlling Persons' theft of some of the policyholder funds and inappropriate investment of other of those funds was disguised by and facilitated through their use of hundreds of pass-through shell companies. Some of these entities are named as Defendants in this action—the Shell Borrowers. *Id.* at ¶¶ 12-45. The Shell Borrowers—along with numerous other pass-through entities that Lindberg and GGHI ultimately own and control—had no independent governance or business operations. *See id.* at ¶ 150. They existed solely as functions of the financial engineering that Lindberg and his co-conspirators used to create the false appearance of independence, facilitate the extraction of policyholder money, and make it harder for Plaintiff Insurance Companies to collect on any defaulted loans. *See id.* at ¶¶ 122, 130-31, 147-50, 160-61, 163-66, 172, 176-81.

Lindberg and the other Controlling Persons were able to effectuate this scheme through a series of misrepresentations and broken promises to the NCDOI. The previous Insurance Commissioner, Wayne Goodwin, had agreed to allow Lindberg, Herwig, and GGHI to invest up to 40% of Plaintiff Insurance Companies' investable assets into other companies that Lindberg controlled, *id.* at ¶ 127, which already exceeded customary industry limits for these types of investments. In their very first annual financial disclosure, they had gone over that 40% cap. *Id.* at ¶ 128. Lindberg, Herwig, and others working at their direction subsequently made repeated false statements to NCDOI, untruthfully claiming that there was independent control of Plaintiff Insurance Companies' investments. *See id.* at ¶¶ 130-38, 140-48. They continued entering into further investments into Lindberg-affiliated companies even

7

when directly told not to do so. *See id.* at ¶¶ 231-32. When NCDOI's scrutiny of these lending arrangements continued, Lindberg attempted to bribe the new Insurance Commissioner, Mike Causey, to remove the regulator assigned to his insurance companies. *See id.* at ¶¶ 212-25.

After the Controlling Persons tried and failed to fix the problems with Plaintiff Insurance Companies' investments in 2018 and the first half of 2019, Lindberg agreed for these companies to be removed from his control and placed under a state-monitored receivership to try to rehabilitate them. *Id.* at ¶¶ 240-251, 262-63. As part of the plan to rehabilitate the Plaintiff Insurance Companies, Lindberg agreed in June 2019 to allow some of his non-insurance companies to be managed by an independent board of directors tasked with repaying the policyholders. *Id.* at ¶ 260. Lindberg and his companies breached their agreement to do so and still have not performed. *Id.* at ¶ 269. Despite refusing to perform his obligations, Lindberg and his companies have accepted and failed to fully repay the tens of millions of dollars of cash and debt relief they received in the same transaction. *See id.* at ¶¶ 261, 268, 270. Instead, Lindberg has diverted and caused to be diverted over $40 million of additional funds that could have been used to repay Plaintiff Insurance Companies, in violation of a court order. *Id.* at ¶¶ 274-77.

Because Lindberg and his companies have not met their obligations to the Plaintiff Insurance Companies, they remain insolvent. As a result, the Wake County Superior Court has ordered these entities into liquidation. *Id.* at ¶ 266 n.3. Lindberg and GBIG appealed this liquidation order despite presenting no evidence that

8

Plaintiff Insurance Companies are solvent or can become so. *Id.* Because of this meritless appeal, Lindberg has denied hundreds of thousands of policyholders access to some or all of the value of their investments. *Id.* at ¶ 266 & n.3.

## <u>Argument</u>

### I. Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–63 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quotation omitted). A claim is facially plausible if the plaintiff alleges factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and shows more than "a sheer possibility that a defendant has acted unlawfully." *Id.*; *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). In considering the motion, the Court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." *Massey v. Ojaniit*, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted).

The sufficiency of a civil RICO claim is judged in accordance with the notice pleading requirement of Rule 8(a), requiring a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). At the same

9

time, however, "where RICO claims are based on predicate acts of fraud, the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure applies." *Field v. GMAC, LLC*, 660 F. Supp. 2d 679, 686 (D. Md. 2011) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)). Rule 9(b) requires that "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## II. Plaintiffs adequately have pleaded federal and state RICO claims.

### a. *Elements of RICO Claims*

Plaintiffs have alleged that Defendants committed violations of all four subparts of the federal RICO statute and the North Carolina RICO statute. Am. Compl. ¶¶ 279-329. Section 1962(a) of Title 18 of the United States Code prohibits "any person who has received any income derived . . . from a pattern of racketeering activity" from using that money to acquire, establish or operate any enterprise that affects interstate commerce. To allege a violation of § 1962(a), a plaintiff must show: (1) receipt of income from a pattern of racketeering activity, and (2) the use or investment of this income in an enterprise. *See Busby v. Crown Supply, Inc.*, 896 F.2d 833, 837 (4th Cir. 1990).

Section 1962(b) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18

10

U.S.C. § 1962(b). To state a claim under subsection (b), plaintiff must plead facts that show: (1) the acquisition or maintenance of an interest in or control; (2) of an enterprise; (3) through a pattern of racketeering activity. 18 U.S.C. § 1962(b); *see Beck v. Prupis*, 529 U.S. 494, 497 (2000).

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). It is "aimed at the use of an enterprise to carry out racketeering activities." *Benard v. Hoff*, 727 F. Supp. 211, 213 (D. Md. 1989). To state a claim under § 1962(c), a plaintiff must allege facts sufficient to show that a defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Whitney, Bradley & Brown, Inc. v. Kammermann*, No. 10-1880, 2011 WL 2489416, at *1 (4th Cir. June 23, 2011).

Subsection (d) is aimed at conspiracies to violate subsections (a) through (c). To state a subsection (d) claim, plaintiff must allege that "each defendant agreed that another co-conspirator would commit two or more acts of racketeering." *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990).

With respect to the claim arising under North Carolina's civil RICO statute, "To state a claim under the NC RICO Act, (1) an innocent person must allege (2) an injury or damage to his business or property (3) by reason of two or more acts of

11

organized unlawful activity or conduct, (4) one of which is something other than mail fraud, wire fraud, or fraud in the sale of securities, (5) that resulted in pecuniary gain to the defendants." *Tucker v. Clerk of Ct. of Forsyth Cnty. ex rel. Frye*, 268 N.C. App. 153, 833 S.E.2d 260 (2019) (internal quotation omitted). Courts look to federal law when interpreting the North Carolina civil RICO statute. *See id.*

Defendants argue that Plaintiffs have failed to adequately allege (1) an enterprise, (2) racketeering activity, and (3) a pattern of racketeering. Each of these challenges applies to an element of multiple claims. Accordingly, Plaintiffs address Defendants' arguments as to each element rather than claim by claim.

### b. Enterprise

First, Defendants argue that Plaintiffs have failed to sufficiently plead the existence of an enterprise. Br. at 6-7. An "enterprise" under RICO "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). To adequately plead an association-in-fact enterprise, Plaintiffs must allege the presence of three structural features: "(1) [a common] purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Mao v. Glob. Tr. Mgt., LLC*, 2022 WL 989012, at *8 (E.D. Va. Mar. 31, 2022) (citing *Boyle*, 556 U.S. at 948). These

12

structural requirements do not constitute an exacting standard, however. *Id.* (observing that the structural requirements of a well-plead association-in-fact "are not extensive"). An association-in-fact enterprise "need not have a hierarchical structure," and "decisions may be made on an ad hoc basis . . . by any number of methods." *Boyle*, 556 U.S. at 948. Group members "need not have fixed roles," and nothing in the statute requires that the group's crimes be "sophisticated, diverse, complex, or unique." *Id.*

Plaintiffs have set forth the existence of an "enterprise" for purposes of their RICO claims. The Amended Complaint describes the relationships between the enterprise members: the Controlling Persons, Am. Compl. ¶¶ 3-10, were the decisionmakers and primary actors that used the Shell Borrowers, Am. Compl. ¶¶ 10, 19-44, in furtherance of defrauding the Plaintiff Insurance Companies. The common purpose of that scheme to defraud was, at its core, taking the Plaintiff Insurance Companies' policyholder money to buy companies for Lindberg through risky and improper investments and to extract those funds for the conspirators' personal enrichment. The manner and means of executing that scheme is set forth in detail throughout the Amended Complaint, including paragraphs 85-123 (describing the extraction of policyholder funds for purchasing companies for Lindberg through improper investment vehicles that were too risky and did not match policyholder obligations), paragraphs 124-166 and 226-241 (describing Defendants' use of additional improper investment structures to disguise and perpetuate their scheme), paragraphs 167-182 (setting out how various Defendants

13

took policyholder money for themselves), paragraphs 183-211 (describing how Lindberg, Herwig, and SASL used a fraudulent investment adviser scheme to take more policyholder money), paragraphs 212-225 (describing how Lindberg tried to bribe the Insurance Commissioner to reduce regulatory scrutiny on his scheme), and paragraphs 267-278 (describing Defendants' ongoing unlawful conduct after Plaintiff Insurance Companies entered rehabilitation). The scheme is again summarized at paragraph 291. Plaintiffs set forth some of the specific overt acts in furtherance of the scheme to defraud at Exhibits A and B to the Amended Complaint, which identify by lender entity, borrower (each of which is or was controlled by a Defendant), date, and amount wire transfers in furtherance of the scheme to defraud and subsequent transfers of the proceeds of the scheme. Plaintiffs allege that these racketeering activities occurred over a substantial period of time—from 2014 through 2023. Am. Compl. ¶ 292. Accordingly, Plaintiffs have alleged the three structural features of a RICO enterprise.

Defendants' argument that the enterprise is redundantly defined, Br. at 6-7, also fails. The Amended Complaint identifies each Defendant as a "person" for purposes of the RICO statutes. Am. Compl. ¶ 280. The enterprise, by contrast, consists of all of the Defendants, plus others, working together to effectuate the scheme described above. Am. Compl. ¶¶ 281-84. Accordingly, the Amended Complaint alleges the existence of an enterprise that is separate from each individual "person" named as a Defendant.

14

Defendants also complain that Plaintiffs use improper "group pleading" that makes it "impossible to determine . . . what each individual Defendant is alleged of doing or what their alleged roles were in any 'enterprise.'" Br. at 7. As an initial matter, this is untrue. The Amended Complaint explains what the Defendants did within the enterprise. With respect to the Shell Borrowers, Plaintiffs' allegations make clear that all of these entities were used for similar purposes—to falsely create the appearance of independence in order to facilitate Defendants' overall scheme. *See* Am. Compl. ¶¶ 130-31, 140-42, 147, 149-50. The Amended Complaint further describes how the use of these entities allowed Defendants to extract policyholder money for their own uses. *See* Am. Compl. ¶¶ 152-62. Exhibits A and B to the Amended Complaint identify specific transactions involving the Shell Borrowers. *See* Am. Compl. Exs. A-B.[1]

With respect to the Controlling Persons, the Amended Complaint describes when an individual or company took a specific action, or when multiple of these Persons did so. *See, e.g.*, Am. Compl. ¶¶ 89 (Lindberg, Herwig, and others working at their direction controlled Plaintiff Insurance Companies' investments), 132 (Defendant GGHI negotiated a misleading disaffiliation scheme with Defendant EMAM), 144 (Lindberg and GGHI retained control of the FinCo entities), 148 (Lindberg, Herwig, and Solow made false statements to their regulator), 177 (AFA

---

[1] Some of the Shell Borrowers received direct loans from Plaintiff Insurance Companies, as set forth in Exhibit A. The remaining Shell Borrowers received Plaintiff Insurance Companies' funds through subsequent transactions.

15

skimmed transaction fees off of borrower conversion), 186-88 (Lindberg and Herwig were directors for SASL, the sham investment adviser they created), 222 (Lindberg attempts to bribe the Insurance Commissioner in order to receive a new regulator).

Certain of Plaintiffs' allegations do allege that the Defendants, or a group of the Defendants, took collective actions in furtherance of their joint fraudulent scheme. But this is a permissible form of pleading in a RICO case when the Plaintiffs' theory is that the unlawful actions were collectively taken or collectively caused to be taken by the Defendants. *See CSX Transp., Inc. v. Gilkison*, No. 5:05CV202, 2012 WL 1598081, at *12 (N.D.W. Va. May 3, 2012). Allegations about groups of defendants provide adequate notice of what the enterprise members are defending when the allegation is that they acted as a group. *See Navient Sols., LLC v. L. Offs. Of Jeffrey Lohman*, No. 119CV461LMBTCB, 2020 WL 1867939, at *7 (E.D. Va. Apr. 14, 2020) ("[P]laintiff's use of group pleading, which only occurs following plaintiff's identification of each specific defendant and their role in the alleged scheme, does not warrant dismissal.").[2] Accordingly, the fact that the Amended Complaint makes allegations that apply to all of the Defendants is not a basis for its dismissal.

_____

[2] Defendants' examples of Plaintiffs' "inconsistent" pleadings, Br. at 8, are not inconsistent at all. Plaintiffs allege that the Enterprise included the entities that are employees and subsidiaries of the Global Growth family of companies—except for the Operating Companies, which are legitimate businesses. Am. Compl. ¶¶ 52, 287. Likewise, Plaintiffs allege that Lindberg and Herwig maintained, at all relevant times, absolute control over the Plaintiff Insurance Companies' investments, Am. Compl. ¶¶ 89, 109, 191, despite creating sham structures that appeared to create independent oversight, Am. Compl. ¶¶ 91, 109. These allegations are not inconsistent—rather, they go to the heart of Defendants' scheme, which frequently

16

### c. *Racketeering Activity and Pattern of Racketeering*

Defendants also argue that Plaintiffs have failed to allege "racketeering activity" because Plaintiffs have alleged only "three allegedly false representations." Br. at 9. Defendants' argument fails because Plaintiffs have specified numerous instances of wire fraud and money laundering as well as bribery in addition to the false statements that Defendants identify.

Civil RICO requires allegations of two or more predicate acts, which are criminal offenses listed in the statute. 18 U.S.C. § 1961(5). Plaintiffs have alleged as one type of predicate act wire fraud in violation of 18 U.S.C. § 1343. Am. Compl. ¶ 291A. The crime of wire fraud includes two essential elements: (1) the existence of a scheme to defraud and (2) the use of wire communication in furtherance of that scheme. *See United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). As a second type of predicate act, Plaintiffs have alleged money laundering in violation of 18 U.S.C. § 1957. Money laundering, under section 1957, is defined as "knowingly [engaging] in a monetary transaction in criminally derived property of a value greater than \$10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Here, the specified unlawful activities are the acts of wire fraud. There is no requirement that the same defendant commit the specified unlawful activity and the subsequent monetary transaction. *See United States v. Cherry*, 330 F.3d 658, 667 (4th Cir. 2003).

---

used the false appearance of legitimacy to cover the rampant fraudulent conduct that they were committing.

Plaintiffs describe the Defendants' scheme to defraud Plaintiffs at length in the Amended Complaint. *See, e.g.*, Am. Compl. ¶ 291A(1)-(25). In sum, Defendants engaged in a multi-year conspiracy to unlawfully extract policyholder funds from the Plaintiff Insurance Companies for their own benefit. Some of those extractions are set forth in Exhibit A to the Amended Complaint—the wires executing wire fraud in violation of 18 U.S.C. § 1343. Subsequent transactions of those funds occurred in the transfers set forth in Exhibit B to the Amended Complaint—which are therefore money laundering transactions in violation of 18 U.S.C. § 1957. Each of these transactions are described with the "who, what, when, and where" of the alleged conduct. Accordingly, through the wire fraud and money laundering offenses Plaintiffs have pleaded sufficient racketeering activity to support their federal RICO claims.

### d. *Predicate Act of Bribery*

Defendants argue that the third type of predicate act that Plaintiffs allege in the Amended Complaint—bribery in violation of 18 U.S.C. § 666 and N.C. Gen. Stat. § 14-218—is insufficient because only Lindberg and GGHI, and not the other Defendants, committed this offense. Br. at 15-16. But Plaintiffs have alleged a conspiracy among all of the Defendants to commit civil RICO. The Fourth Circuit has rejected the idea that each defendant must personally commit two or more predicate acts. To require *each* defendant to commit two or more predicate acts "would require that RICO conspirators be involved in the affairs of a conspiracy to a

18

greater extent than required in other conspiracies. The heart of a conspiracy is the agreement to do something that the law forbids." *Pryba*, 900 F.2d at 760.

Accordingly, it is not necessary that each defendant engage in two or more predicate acts, only that the defendants collectively committed two or more predicate acts as part of their pattern of racketeering. *Id.*; *see also CSX Transp., Inc. v. Gilkison*, No. 5:05CV202, 2012 WL 1598081, at *11-12 (N.D. W. Va. May 3, 2012). Lindberg's attempted bribery of the Insurance Commissioner—which he committed as part of the overall scheme to defraud in an effort to conceal the scheme from the regulator and to allow it to continue—is thus properly alleged as part of Defendants' racketeering activity. Because Plaintiffs sufficiently alleged this attempted bribery, in addition to the wire fraud and money laundering described above, Plaintiffs also adequately alleged their North Carolina RICO claim.

### III. Plaintiffs adequately have pleaded their challenged state law claims.

Defendants do not contend that Plaintiffs inadequately have alleged their state law claims for constructive fraud (Counts Six and Seven). Defendants, however, do argue that Plaintiffs have failed to allege adequately their state-law claims for violations of Section 75-1.1 of the North Carolina General Statutes and for civil conspiracy. For the reasons set forth below, the Court should dismiss neither.

#### a. Violations of Section 75-1.1 of the North Carolina General Statutes

To state a claim under the UDTPA, a claimant must allege (1) an unfair or deceptive act or practice; (2) in or affecting commerce; (3) which proximately caused

19

injury to the plaintiff or his business. *See* N.C. Gen. Stat. § 75–1.1; *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 653 S.E.2d 393, 399 (2007); Dalton v. Camp, 353 N.C. 647, 548 S.E.2d 704, 711 (2001). Conduct in violation of the UDTPA must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See, e.g.*, *Gilbane Bldg. Co. v. Fed. Reserve Bank*, 80 F.3d 895, 902 (4th Cir. 1996); *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 418 S.E.2d 694, 700 (1992). An act is deceptive if it has a tendency or capacity to deceive. *See Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397, 403 (1981). An act is unfair "if it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of . . . power or position." *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 684 S.E.2d 41, 50 (2009) (quotation omitted) (emphasis removed); *see Gilbane Bldg. Co.*, 80 F.3d at 902. "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." *Kelly v. Ga.–Pac., LLC*, 671 F. Supp. 2d 785, 798-99 (E.D.N.C. 2009) (collecting cases).

Defendants' only argument for why Plaintiffs have failed to state a claim under the UDTPA is their theory that Plaintiffs' allegations do not sufficiently distinguish between the various Defendants. Br. at 17. This argument fails for the reasons set forth above. Moreover, because Plaintiffs adequately have alleged wire fraud against Defendants, they have alleged a UDTPA violation as well. *See, e.g.*, *Jones v. Harrelson & Smith Contractors, LLC*, 194 N.C. App. 203, 217, 670 S.E.2d 242, 252 (2008), *aff'd per curiam*, 363 N.C. 371, 677 S.E.2d 453 (2009). Constructive fraud also

20

per se gives rise to a claim under the UDTPA. *See, e.g.*, *Compton v. Kirby*, 157 N.C. App. 1, 20, 577 S.E.2d 905, 917 (2003); *Governors Club, Inc. v. Governors Club Ltd. P'ship*, 152 N.C. App. 240, 250, 567 S.E.2d 781, 788 (2002), *aff'd per curiam*, 357 N.C. 46, 577 S.E.2d 620 (2003).

Even if Plaintiffs failed to state either of these claims giving rise to a per se UDTPA violation, the UDTPA "is broader and covers more than traditional common law proscriptions on tortious conduct . . . ." *Bumpers v. Cmty. Bank of N. Virginia*, 367 N.C. 81, 88, 747 S.E.2d 220, 226 (2013). The conduct at issue—where Defendants took advantage of their position of trust and confidence with Plaintiffs and Plaintiffs' policyholders, who had no ability to protect themselves from Defendants' conduct, to enrich themselves at the expense of these innocent policyholders—is squarely within the UDTPA's ambit.

### b. Civil Conspiracy

The Defendants argue for the dismissal of Plaintiffs' conspiracy claim as "no claim at all." Br. at 17. In North Carolina, "[t]here is no independent cause of action for civil conspiracy." *Toomer v. Garrett*, 155 N.C. App. 462, 483, 574 S.E.2d 76, 92 (2002). However, if the plaintiff can establish the existence of a civil conspiracy, all of the conspirators will be jointly and severally liable for the act of any other conspirator undertaken in furtherance of the conspiracy. *See Lee v. Certainteed Corp.*, 123 F. Supp. 3d 780, 803 (E.D.N.C. 2015).

To demonstrate the existence of a civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a

lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 72 (2008) (quoting *Privette v. University of North Carolina*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)).

Here, the Amended Complaint alleges that the Defendants entered into an agreement to harm Plaintiffs through the common scheme of misuse of policyholder funds, to Plaintiffs' injury. The conspiracy was effectuated through Defendants' racketeering activity and constructive fraud, as set forth in detail in the Amended Complaint. These allegations "are sufficient to put Defendants on notice regarding their claim for civil conspiracy," *Eli Research, Inc. v. United Commc'ns Grp., LLC*, 312 F. Supp. 2d 748, 764 (M.D.N.C. 2004), and thus sufficient to survive a Rule 12 motion to dismiss.

## IV. There is no basis to stay this case during the pendency of separate breach of contract cases.

Finally, Defendants ask that the Court stay this proceeding until other cases involving breaches of contract by various Lindberg-owned borrowers "are finally resolved." Br. at 18. To the extent that the Court construes Defendants' Response as a motion to stay, it should be denied.

"A court has the power to stay proceedings, which is 'incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Doe v. Bayer Corp.*, 367 F. Supp. 2d 904, 914 (M.D.N.C. 2005) (quoting *Landis v. N. Am. Co.*, 299

22

U.S. 248, 254 (1936)). "The party seeking a stay must justify it by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *Williford v. Armstrong World Indus., Inc.*, 715 F.2d 124, 127 (4th Cir. 1983). "When considering a motion to stay, the district court should consider three factors: '(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party.'" *Impulse Monitoring, Inc. v. Aetna Health, Inc.*, 2014 WL 4748598, at *1 (D.S.C. Sept. 23, 2014) (quoting *Johnson v. DePuy Orthopaedics, Inc.*, 2012 WL 4538642, at *2 (D.S.C. Oct. 1, 2012)).

Defendants fail to identify or analyze any of the factors relevant to whether a stay should be granted. They make no effort to demonstrate by a clear and convincing standard that any justification for a stay outweighs the harm to Plaintiffs of not being able to pursue their claims. Their sole stated basis for a stay is a risk of inconsistent rulings.[3] But the cases that Defendants point to involve breaches of contract by Lindberg-owned companies, where the relevant conduct and damages are completely separable from this fraud and racketeering matter.[4] Moreover, Defendants do not

[3] The case that Defendants cite in support of their request for a stay, *Duke Energy Progress, Inc. v. Frontier Commc'ns of the Carolinas, Inc.*, No. 5:13-CV-617-FL, 2014 WL 4948112, at *3 (E.D.N.C. Sept. 25, 2014), involved an analysis of whether to stay the proceedings in favor of a regulatory agency's related proceeding. It is wholly inapposite.
[4] The defendants in those cases breached their loans despite, according to Lindberg, generating $1.7 billion of revenue in 2022. Am. Compl. ¶ 162. Lindberg and his companies also have not used these proceeds to pay off the judgment that this Court previously entered against Defendant AFA. *See Colorado Bankers Life Ins. Co. v.*

explain "what that inconsistency is likely to be and why traditional rules of preclusion, such as res judicata and collateral estoppel, would not guard against such a risk." *Wilmington Trust, Nat'l Ass'n v. Nat'l Gen. Ins. Co.*, No. 1:21CV207, 2021 WL 2531063, at *12 (M.D.N.C. June 21, 2021). Accordingly, Defendants have not carried their burden to show that a stay would be appropriate here.

## <u>Conclusion</u>

For the foregoing reasons, Plaintiffs adequately have set forth their claims, and they respectfully request that the Court deny Defendants' Partial Motion to Dismiss.

Respectfully submitted, this the 30th day of November, 2023.

WILLIAMS MULLEN

/s/ Caitlin M. Poe
Wes J. Camden
N.C. Bar No: 33190
wjcamden@williamsmullen.com
Caitlin M. Poe
N.C. Bar No.: 44713
cpoe@williamsmullen.com
Lauren E. Fussell
N.C. Bar No.: 49215
lfussell@williamsmullen.com
301 Fayetteville Street, Suite 1700 (27601)
PO Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
*Attorneys for Plaintiffs*

---

*Academy Fin. Assets, LLC*, No. 5:20-CV-185-D (E.D.N.C.), *summ. j. aff'd*, 60 F.4th 148 (4th Cir. 2023).

24

<u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.2(f)(3), I certify that the foregoing brief contains

6026 words, fewer than the 8400-word limit.

This the 30th day of November, 2023.

/s/ Caitlin M. Poe
Caitlin M. Poe

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day the foregoing document was electronically filed with the Clerk of Court and served on all counsel of record using the Court's CM/ECF system. I hereby certify that I have e-mailed the document to the following non-CM/ECF participants:

Devin Solow
c/o W. Rob Heroy
rheroy@goodmancarr.net

This the 30th day of November, 2023.

WILLIAMS MULLEN

/s/ Caitlin M. Poe
Wes J. Camden
N.C. Bar No: 33190
wjcamden@williamsmullen.com
Caitlin M. Poe
N.C. Bar No.: 44713
cpoe@williamsmullen.com
Lauren E. Fussell
N.C. Bar No.: 49215
lfussell@williamsmullen.com
301 Fayetteville Street, Suite 1700 (27601)
PO Box 1000
Raleigh, NC 27602
Telephone: (919) 981-4000
Facsimile: (919) 981-4300
*Attorneys for Plaintiffs*

26